Julie CHALMERS, Plaintiff,

v.

CITY OF LOS ANGELES, Defendant.

No. CV 79–0124.

United States District Court,
C.D. California.

Dec. 1, 1987.

John Murdock, Santa Monica, Cal., for plaintiff.

Marcia H. Kamine, Los Angeles, Cal., for defendant.

### ORDER RE: ATTORNEY FEES

LAUGHLIN E. WATERS, Senior District Judge.

On January 10, 1979 Julie Chalmers filed an action pursuant to 42 U.S.C. § 1983 against the City and County of Los Angeles alleging a deprivation of due process. After a 5-day trial in October, 1982, a jury awarded Chalmers damages in the amount of $28,223, and the Ninth Circuit affirmed the judgment in June, 1985. On January 10, 1983 Chalmers moved for an award of attorney fees pursuant to 42 U.S.C. § 1988. On July 5, 1983, this court entered an order awarding Chalmers attorney fees in the amount of $82,600. Subsequently, this court entered an amended order wherein the amount of the attorney fee award and the discussion of the merits of that award remained unchanged from that of the previous order. The City appealed that award, and the Ninth Circuit in an opinion filed August 15, 1986, 796 F.2d 1205, vacated the order for fees and remanded for further explication of the basis of the award. This court subsequently filed and spread the mandate of the Ninth Circuit and took the matter under submission to consider the guidelines suggested in the Circuit's ruling in this case and the Supreme Court's opinion filed on June 26, 1987 in a case directly on point, *Pennsylvania, et al. v. Delaware Valley Citizens' Council for Clean Air, et al.,* — U.S. —, 107 S.Ct.

3078, 97 L.Ed.2d 585 (1987). Having considered those opinions, the parties' papers submitted in connection with this matter, and the court's first-hand knowledge and observations of the underlying trial proceedings, the court finds as follows.

■ Title 42 U.S.C. § 1988 provides that in federal civil rights actions "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney fee as part of the costs." The initial estimate of a reasonable attorney fee—i.e., the "lodestar"—is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate. *Blum v. Stenson,* 465 U.S. 886, 888, 104 S.Ct. 1541, 1543, 79 L.Ed.2d 891 (1984). Adjustments to that fee then may be made as necessary in a particular case. *Id.*

*The Lodestar*

■ In determining reasonable hours, counsel bears the burden of submitting detailed time records justifying the hours claimed to have been expended. *Blum v. Stenson,* 465 U.S. 886, 888, 104 S.Ct. 1541, 1543, 79 L.Ed.2d 891 (1984). The court may reduce those hours where they are duplicative, excessive, and to the extent that time was spent on matters upon which the prevailing party lost. *Id.* To ascertain the reasonable hourly rate, the experience, skill, and reputation of the attorney requesting fees are relevant factors. The court should also be guided by the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation. *Id.* at 895, n. 11, 104 S.Ct. at 1547, n. 11.

■ In addition, the Ninth Circuit has articulated a number of other factors the district court should consider in making its determination of both the number of hours reasonably expended and a reasonable hourly rate. Among those factors are: the outcome of the results of the proceedings; the novelty or the difficulty of the questions presented; the undesirability of the case; the nature and length of the professional relationship; the nature of the fee

arrangement; and awards in similar cases. *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67 (9th Cir.1975), *cert. denied sub nom., Perkins v. Screen Extras Guild, Inc.,* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976). Insofar as these factors are considered in setting a reasonable rate and number of hours, the resulting product of those factors heretofore has been presumed to be the reasonable fee contemplated by section 1988. *Blum,* 465 U.S. at 897, 104 S.Ct. at 1548.

### The Kerr Factors Applied Here

█ The questions of fact and law presented in the instant case were not particularly complicated. The case arose as a result of a conflict between two ordinances enacted by the City of Los Angeles, which ordinances failed to give plaintiff appropriate guidance in her attempt to legally sell T-shirts in the vicinity of the King Tut Exhibition at the Los Angeles County Art Museum. The conflict between these ordinances had been brought to the attention of the Los Angeles City Council on a number of earlier occasions, but no resolution of the conflict was achieved prior to the incidents giving rise to this lawsuit. The clarification finally adopted did not become legally effective prior to the time plaintiff commenced selling the T-shirts. As a direct consequence of the the City's continuing failure to earlier clarify the existing conflict, the plaintiff had a right to sell T-shirts in the vicinity of the exhibition prior to the legally effective date of the correcting ordinance.

The judgment against the City in this case did not result in a vindication of any significant individual rights other than to impress upon the City the necessity that where certain conduct is proscribed by ordinance with criminal sanctions, there is a duty on the part of the City to clearly identify the limits of the conduct involved.

Plaintiff has been represented by the same attorney since the initiation of this lawsuit. The time involved by plaintiff's counsel, a sole practitioner, precluded him from engaging in other employment for

which attorney fees might have been guaranteed. The factors of contingency and undesirability of this case will be considered later in the analysis.

### Hours Reasonably Expended

Plaintiff's counsel has submitted extensive billing records and declarations attesting to the number of hours reasonably expended in pre-trial, trial, and post-trial matters in this case. After considering the factors discussed in *Kerr* as applied to this case, and after making certain adjustments for time spent that was not required for the successful prosecution of the case, the court determines the reasonable hours expended in this case to be as follows:

(a) Hours reasonably expended at pre-trial and trial:

| Year | Hours |
|------|-------|
| 1978 | 16.00 |
| 1979 | 55.30 |
| 1980 | 140.50 |
| 1981 | 26.85 |
| 1982 | 76.00 |

(b) Hours reasonably expended for fee motion:

| Year | Hours |
|------|-------|
| 1983 | 30 |

(c) No award for appellate court services.

(d) Total awardable hours . . . . . . . . . . . . 344.65

### Reasonable Rate

A critical inquiry in determining a reasonable attorney fee for purposes of Section 1988 is the establishment of the reasonable hourly rate. *Blum,* 465 U.S. at 895, n. 11, 104 S.Ct. at 1547, n. 11. The prevailing market rate in the community is indicative of a reasonable hourly rate. *Id.* at 895, 104 S.Ct. at 1547. The fee applicant has the burden to, and did, producing satisfactory evidence, in addition to the affidavits of counsel, that the requested rates are in line with those prevailing in the community for similar services of lawyers of reasonably comparable skill and reputation. *Id.* at 895–97 and n. 11, 104 S.Ct. at 1547–48 and n. 11. Plaintiff's counsel has requested the following compensation schedule for his work in this litigation:

| Year | Rate Per Hour |
|------|---------------|
| 1978 | $ 95.00 |
| 1979 | $115.00 |
| 1980 | $135.00 |
| 1981 | $155.00 |
| 1982 | $175.00 |
| 1983 | $175.00 |

Counsel has submitted affidavits indicating that the prevailing rate for attorneys with comparable experience, ability and reputation in 1978 was $95.00 per hour. In addition, Judge Takasugi in the case of *Clark v. City of Los Angeles,* 803 F.2d 987 (9th Cir.1986), a case similar to the one at bar, found that $95.00 was the appropriate hourly rate for applicant in his calculation of reasonable attorney fees in that 1978 case. The court accepts the hourly rate of $95.00 for the year 1978.

Counsel has also submitted several affidavits demonstrating that the prevailing rate for attorneys of similar competence and experience in 1982 ranged from $135.00 to $150.00. The Ninth Circuit in its opinion on the attorney fees issue in this case has stated that "all documentation submitted by counsel ... support his request for compensation at a rate of $175.00" for his work in 1982–3. *Chalmers v. City of Los Angeles,* 796 F.2d 1205 (9th Cir.1986). Accordingly, this court finds that the hourly rate of $175.00 for work done in 1982 and 1983 is reasonable.

Furthermore, an average historical rate for the years prior to 1982 can be calculated by measuring the difference between the 1978 rate ($95.00) and the 1982 rate ($175.00) and assigning a graduated increase in the rate over those years. Application of that formula yields the rates of $115.00 for 1979, $135.00 for 1980, and $155.00 for 1981. These historical rates seem reasonable in light of the counsel's persistence and competence in this case and the affidavits submitted by plaintiff attesting to counsel's excellent reputation in the legal community. Moreover, the record here contains no contrary affidavits suggesting that this rate is not in keeping with the prevailing rates in the community.

Accordingly, calculation of the reasonable number of hours times the reasonable hourly rate for each year in which counsel was engaged in this litigation results in the following figures:

| Year | Fee |
|------|-----|
| 1978 | $ 1,520.00 |
| 1979 | $ 6,359.50 |
| 1980 | $18,967.50 |
| 1981 | $ 4,161.75 |
| 1982 | $13,300.00 |
| Total .................... | $44,308.75 |

The corresponding figure for the attorney fee motion is as follows:

| Year | Total |
|------|-------|
| 1983 | $5,250.00 |
| Total fee-motion figure .... | $5,250.00 |
| Total lodestar .......... | $49,558.75 |

*The multiplier*

Plaintiff's counsel urges that the court apply a multiplier to boost the figure arrived at by multiplying the reasonable hours times the reasonable rates. The question of what circumstances will justify a fee enhancement has been the subject of much debate throughout the circuits. The Supreme Court addressed the question in *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) and, more recently, in *Pennsylvania, et al. v. Delaware Valley Citizens' Council for Clean Air, et al.,* —— U.S. ——, 107 S.Ct. 3087, 97 L.Ed. 2d 585 (1987). The Supreme Court held in *Blum* and reiterated in *Delaware Valley* that the product of reasonable hours times a reasonable rate normally provides a reasonable attorney fee within the meaning of section 1988. *Blum,* 465 U.S. at 897, 104 S.Ct. at 1548; *Delaware Valley,* 107 S.Ct. at 3087. However, the Supreme Court has recognized that adjustments, both upward and downward, to the lodestar amount are sometimes appropriate, albeit in "rare" and "exceptional" cases. *Id.* 465 U.S. at 898–901, 104 S.Ct. at 1548–1550. Plaintiff's counsel argues that this is one of those rare cases where a multiplier is justified based on the following considerations: (1) the complexity, undesirability, and ultimate success in litigating this case against the City of Los Angeles; (2) the risk of not prevailing; and (3) delay in payment. In addition, the unequal positions of the parties to this litigation is an important factor.

*Undesirability and Success of Plaintiff's Case*

■ Plaintiff in the fee motion argues that a multiplier is necessary here because the issues were difficult, the City was a particularly undesirable adversary, and therefore the case was time-consuming and costly. The Supreme Court however clearly ruled in *Blum* and *Delaware Valley* that a fee enhancement cannot be awarded solely on the basis of those considerations.

The Supreme Court in *Blum* noted that consideration of the *Kerr* factors is largely subsumed within the initial lodestar calculation, rather than the subsequent determination of whether to adjust the fee upward or downward. The Supreme Court, therefore, has rejected any upward adjustment on the lodestar fee based on the complexity of the litigation, the novelty of the issues, the high quality of representation, and the great benefits to the plaintiff. *Blum*, 465 U.S. at 898, 104 S.Ct. at 1548. The *Blum* Court noted that the novelty and the complexity of the issues were fully reflected in the number of billable hours reported by counsel. *Id.* In addition, the special skill and experience of counsel as well as the quality of representation are factors ordinarily reflected in the reasonable hourly rate. *Id.* Similarly, the result obtained or outcome of the litigation "generally will be subsumed within other factors used to calculate a reasonable fee, [and] ... normally should not provide an independent basis for increasing the fee award." The record in this case does not show that the issues were unusually complex or that the results obtained were exceptional. Accordingly, this court finds that an enhancement of the lodestar fee here on the grounds of complexity of the issues or results obtained is not warranted.

Counsel also argues that a multiplier is necessary to compensate for the extreme undesirability of litigating against the City. The City, he argues, is "unreasonable as a litigating firm" and was a particularly obstreperous adversary in this case. (Record on appeal at 89.) A majority of the Supreme Court has recently observed that the tenacity and stubbornness of an opponent are factors usually recognized in the lodestar and are insufficient bases by themselves for justifying a multiplier. *Delaware Valley*, 107 S.Ct. at 3080 (J., White, plurality); 3089 (J., O'Connor, concurring.). The City's uncooperative conduct in this case, therefore, is an insufficient basis on its own for a multiplier.

*The risk multiplier*

While section 1988 does not expressly provide for using the risk of not prevailing as an independent basis for increasing an otherwise reasonable fee, *Delaware Valley*, 107 S.Ct. at 3080, the courts in most circuits have almost unanimously adopted that practice. *Id.* The commentators have debated extensively the validity of such a risk multiplier and the Supreme Court recently addressed this narrow question in *Delaware Valley*. *Id.*

An often-cited and rational explanation in support of the risk enhancement appears in *Wildman v. Lerner Stores Corp.*, 771 F.2d 605 (1st Cir.1985). The court in *Wildman* wrote: "the lodestar figure alone does not differentiate between the case taken on a full retainer and a case in which an attorney spends many hours over a period of months or years with no assurance of any pay if the suit is unsuccessful. Even if the client ultimately prevails, the burden of supporting salaried employees and fixed costs during the course of the contingent litigation can be substantial.... To deny all considerations of the added burden and additional risks an attorney under a contingent fee agreement may have to bear does not strike us as 'reasonable.'" Several legal commentators have endorsed this approach. *See, e.g.,* Berger, *Court Awarded Attorney Fees: What is "Reasonable"?*, 126 U.Pa.L.Rev. 281, 324–325 (1977) ("the experience marketplace indicates that lawyers generally will not provide legal representation on a contingent basis unless they receive a premium for taking that risk.").

On the other hand, the D.C. and Seventh Circuits have rejected the practice and have been skeptical of the purpose of applying a risk multiplier. *See, e.g., Laffey v. Northwest Arilines, Inc.*, 746 F.2d 4 (D.C.Cir. 1984), *cert. denied*, 472 U.S. 1021, 105 S.Ct.

3488, 87 L.Ed.2d 622 (1985) (denying risk multiplier because of dangers of conflict and inequities discussed by plurality in *Delaware Valley*); *McKinnon v. Berwyn*, 750 F.2d 1383, 1392 (7th Cir.1984).

The Ninth Circuit itself has taken seemingly contradictory positions on this issue: in some cases it has observed that the contingent nature of litigation may justify an enhancement of the lodestar, *see La-Duke v. Nelson*, 762 F.2d 1318, (9th Cir. 1985); *Rothfarb v. Hambrecht*, 649 F.Supp. 183 (N.D.Cal.1986), while in others it has suggested that contingency is an improper independent rationale for application of a multiplier. *See, Chalmers v. City of Los Angeles*, 796 F.2d 1205, n. 4.

The Supreme Court in *Delaware Valley* attempted to resolve the conflict in the circuits. The Court specifically addressed the issue of whether, under fee-shifting statutes such as section 1988, when a plaintiff prevails, its attorney, under a contingent fee arrangement, may be awarded separate compensation for the risk of losing and not being paid. The Supreme Court ruled that the lower court unjustifiably enhanced the fee award to compensate for the risk of not prevailing. However, like the circuits which addressed the issue before *Delaware Valley*, the Justices of the Supreme Court sharply disagreed on the question of what circumstances, if any, would validate application of a risk multiplier in the award of section 1988 damages. Three separate opinions, each positing different analytical approaches, were filed: Justice White, writing for four Justices, delivered the judgment of the Court in a plurality opinion; Justice O'Connor wrote a separate opinion, concurring in the judgment and only part of the plurality opinion; and Justice Blackmun authored a dissenting opinion joined by four Justices.

The plurality opinion held that the district court in that case unjustifiably boosted fees to compensate the moving party for the risk of not prevailing. In so ruling, the plurality reasoned that the record failed to show that without risk-enhancement plaintiff would have faced "substantial difficulties in finding counsel in the local or other relevant market." In addition, while the district court purportedly applied a risk multiplier because "new and novel issues" were involved, it failed to specifically identify any new and novel issues. Also, the case concerned the reasonable attorney fee for enforcement of a consent decree, and the Court reasoned that there was little risk in enforcing a decree if plaintiff was successful in having one entered. Furthermore, the Court ruled that even assuming *arguendo* that a risk multiplier was valid, the district court's doubling of the lodestar was excessive and such a multiplier ordinarily should not exceed one-third of the lodestar.

While the plurality limited its holding to a reversal of the district court's application of a risk multiplier in that case, Justice White argued in a substantial portion of the opinion that in the absence of further legislative guidance, multipliers or other enhancement of a reasonable lodestar fee to compensate for assuming the risk of loss is impermissible under section 1988 and other fee-shifting statutes. Justice White's premise was that such an enhancement would have to be based on the likelihood that plaintiff would succeed on the merits. As such, using the risk multiplier would raise the problem of measuring *at the end of the trial* plaintiff's likelihood of success as it existed at the *beginning of the litigation.* Such an inquiry would also raise potential conflicts of interest between attorneys and the client, because the attorney would be forced to make a record of the weaknesses in the client's case. In addition, it would create a situation where defendants with the strongest defenses were penalized. The defendants with the strongest defenses, and thus seemingly least culpable, effectively would subsidize plaintiffs' attorneys for other unsuccessful litigation. That situation, he claimed, contradicts the congressional policy of only awarding prevailing parties in the litigation.

Four Justices in the dissent and Justice O'Connor in the concurrence specifically disagreed with the plurality's *per se* rejection of the risk multiplier. The appropriate enhancement for risk, the dissent suggest-

ed, does not depend initially on the *degree* of risk in a particular case, but rather the very fact of the contingency arrangement itself. Even contingent cases with the best merit, they pointed out, may sometimes fail, delay in payment is inherent in any contingent arrangement, and other economic risks may be exacerbated by the contingency in payment. Without the possibility of enhancement for contingency, an economically rational attorney would prefer non-contingent employment to contingent cases. That would inevitably undermine Congress' intention to provide fee awards "similar to what is traditional with attorneys compensated by a fee-paying client," *Id.* 107 S.Ct. at 3093. Enforcement of the civil rights laws thereby would be encouraged. It would also contradict long-established rules of professional conduct for lawyers which have approved the payment of premiums for compensation of risk.

Under the dissent's analysis, the court should award a risk multiplier for a section 1988 award if it determines that the case was taken on a contingency basis. The appropriate enhancement initially can be ascertained by reference to the "premium for contingency that exists in prevailing market rates." The court can then fine-tune the appropriate multiplier by considering whether the attorney was able to mitigate the risk of nonpayment in any way; for example, where the client has agreed to pay a portion of the lodestar regardless of the outcome of the case. The court should consider other economic factors in adjusting the multiplier, such as cash-flow problems caused by the delay in payment, the size and circumstances of the attorney's practice, and whether the case is significant and of broad public interest. By awarding a risk multiplier across-the-board in contingency cases, the court avoids the problems raised by the plurality of exploring the likelihood of success of the case on the merits, of potential conflicts between lawyer and client, and that of a large enhancement disproportionate to the success in the case.

Justice O'Connor occupied the middle ground in the debate. In concluding that Congress did not intend to foreclose consid-

eration of contingency in setting a reasonable fee under section 1988, she reasoned, in line with the dissent, that compensation for contingency must be based on the difference in market treatment of contingent fee cases as a class, rather than on the riskiness of any particular case. However, in joining the judgment of the plurality to reject a multiplier in this case, she indicated that the party seeking the enhancement failed in that case to meet its burden to show: (1) the degree to which contingency is compensated in the relevant market; and (2) that large enhancements were necessary to attract competent counsel in the relevant community.

Several principles can be gleaned from the Supreme Court's opinions in *Delaware Valley*. First, it appears that the dissent is correct in stating that the majority of the Court leaves open the opportunity for district courts to award enhancements for contingency in selected cases. *Id.* 107 S.Ct. at 3095. A primary inquiry in determining whether an enhancement is justified is whether, absent an enhancement, the party would have substantial difficulties finding an attorney. The Court should also consider the risk of success of civil rights cases as a class, and not that of the particular case at bar. Other relevant factors are: length of delay in payment, the size and circumstance of the attorney's practice, whether the case is of broad public interest, and extent to which the fee agreement with the client mitigates the economic risk of the contingency. In setting the multiplier, the court should also consider whether the record reflects the premium charged in the community for the risk of no recovery.

The Court in *Delaware Valley* gave little guidance as to the meaning of the "substantial difficulties" test. The plurality merely stated that the fee award should be sufficiently high to make it possible to achieve the statutory purpose of making it possible for poor clients with good claims to secure "competent help." *Delaware Valley* at 3086. It cited in a footnote a Second Circuit case, which stated that "an attorney's fee award should be only as large as necessary to attract competent

counsel" and "one relevant factor bearing on high-risk is whether other counsel had declined to take the case because there was little or no prospect of earning a fee." *Id.* at 3088, n. 12, *citing Lewis v. Coughlin,* 801 F.2d 570, 576 (2d Cir.1986). The plurality opinion fails to mention any other evidentiary factors which it considered relevant in applying the test. In addition, the Court provides no guidance as to the appropriate size of the multiplier.

Although the Supreme Court failed to clarify its "substantial difficulties" test, other court opinions that have considered the question of the multiplier are helpful in applying the standard. For instance, the district court in *Cherry v. Rockdale County,* 601 F.Supp. 78 (N.D.Ga 1984), a case Justice White mentioned approvingly in footnote 9 of the plurality opinion, suggested that an enhancement is justified only if it is necessary to get "overall compensation of attorneys representing the affected class to a sufficient level to attract capable advocates." The Court denied a risk multiplier because counsel presented no evidence to meet that test, but it proceeded to offer the type of evidence and analysis which it would find persuasive in future cases.

It first considered that if the two attorneys requesting fees were paid at the rate of the top 25% of law firm partners admitted at the same time were paid, they would earn $89,800 and $77,800 per annum respectively. The salaries for associates with similar seniority as the applicants were $61,300 and $56,800 per annum. These rates, the court assumed, were sufficient to attract capable attorneys.

The same survey showed an average overhead of $47,000 per attorney in a small firm. The court then assumed that attorneys billed 2,000 hours per year and relied on the parties affidavits that stated a reasonable hourly wage was $100.00 per hour. The court then calculated an annualized income, adjusting for an assumed loss rate of one-third and an assumed loss rate of one-half of billable hours, which accounts for inability to obtain compensation for that amount of billable hours. The court concluded that if the loss rate for the average capable civil rights lawyer is one-third of his potential billable hours, then his compensation would be $85,000 ($200,000 minus $68,000 (uncollectable) minus $47,000 (overhead) equals $85,000), which is in line with the earnings of the top 25% of the lawyers with years of experience similar to that of plaintiffs's counsel. If the loss rate were one-half, then the compensation would $53,000, and some enhancement would be necessary. However, under the loss rates of one-half and one-third, a 50% multiplier would produce estimated per annum compensation at $151,000 and $103,-000, which approaches a windfall.

As the district court in *Cherry* admitted, there are probably other factors which come into play in the analysis of whether competent counsel would take the civil rights case at bar. Nevertheless, the court has provided a rough methodology which can be adjusted to meet the circumstances of a particular case. Especially interesting is the importance of the loss rates in the district court's analysis. A consideration of that element is consistent with the *Delaware Valley*'s emphasis of riskiness of civil rights cases overall, as opposed to that of an individual case.

The district court in *Thompson v. Barrett,* 599 F.Supp. 806, 815 (D.C.Cir.1984) also focused on loss rates of civil rights cases in granting a risk multiplier in that case. The court specifically referred to statistics prepared by the Office of the United States Attorney for the District of Columbia in its annual report for 1978, the year that case initially went to trial, which revealed that for all Title VII cases brought in the District of Columbia, the plaintiffs prevailed in only 12 out of the 63 cases which went to trial. Thus, a bare statistical analysis would give the plaintiffs only a 19% chance of success even if it were the "typical" Title VII case. Since that case involved a tortuous procedural history and addressed several questions of first impression of broad public interest, the court found that its chances of success were much lower than even the 19% noted above.

The *Thompson* court also highlighted the delay factor in its risk analysis. The court emphasized that the it was six full years before a decision had been rendered in that case. The Court of Appeals affirmed after the case had been pending for nine years. Thus the court found that, not only was the case risky, but it was risky for a long time. The Court awarded a 50% enhancement based on risk. The *Thompson* court's approach is consistent with the *Delaware Valley* dissent's suggestion that delay should be considered in judging the propriety of a risk multiplier.

Another analytically helpful opinion is *Wildman v. Lerner*, 771 F.2d 605, 611 (1st Cir.1985). There the First Circuit rationalized the award of a modest risk adjustment with a particularized analysis that examined the "actual risks or burdens that are borne by the lawyer or lawyers," including:

1. "[W]hat, if any, payment each attorney would have received had the suit not been successful"

2. "[W]hat, if any, costs or expenses each attorney would have incurred if the case had been lost"

3. "[W]hether the successful attorneys were completely dependent upon court-awarded fees for their compensation"

4. "[T]he length of time and number of hours the case consumed," during which the lawyers were required to bear salary and overhead expenses "without assurance of compensation" and

5. "[W]hether other attorneys refused to take the case because of a risk of non-payment." *Id.* at 611–14.

In addition, several cases have recognized that a factor strongly favoring the award of a risk adjustment is the massive expenditure of time, energy, and resources—especially by a small firm to the preclusion of other employment—on civil rights litigation that entailed a substantial risk of failure and hence of nonpayment. See, *e.g.*, *Vaughns v. Bd. of Educ.*, 770 F.2d 1244, 1246 (4th Cir.1985); *Craik v. Minnesota State Univ. Bd.*, 738 F.2d 348, 350–51 (8th Cir.1984). Another factor deserving consideration is how many cases similar to the instant case has the attorney refused after undertaking the case at bar.

*The instant case*

■ The court finds that the circumstances of this case justify a multiplier to compensate for the risk that plaintiff's attorney would be paid almost nothing for several hundred hours of work in prosecuting this lawsuit.

Initially, the court notes that the lodestar amount which the court has calculated does not reflect any increment whatsoever for a greater-than-normal risk of failure in this litigation. Thus, application of a multiplier raises no double-counting problem.

The court further finds that the record in this case suggests that, absent the enhancement, plaintiff would have substantial difficulties attracting qualified counsel. First, the court's own experience indicates that the loss rate of cases like the one at bar is so marked as to raise a serious question of whether plaintiff here would prevail on her claims.

Second, the court finds that the undesirability of litigating against the City in this case was extremely high. The city, for instance, expended a seemingly unlimited amount of time and money in defense of the claims, even though it acknowledged the conflict between the ordinances involved here. That is exemplified in its use of a helicopter to take aerial photographs of the vicinity of the museum for use as exhibits in trial. Neither this plaintiff nor any private litigant could or would spend comparable resources on a claim like this. The court is also mindful of the City's obstreperous conduct in pursuing its defense. The City in this case, as in other cases familiar to the court, seemed to make every conceivable motion prior to trial, make every conceivable objection during trial, and automatically appeal the verdict after trial. The City's vigor in fighting plaintiff's request for fees further illustrates its recalcitrant posture in the case. Accordingly, as one court wrote: "Those who elect a militant defense in the face of a statute allowing attorney's fees if they are defeated must take into account the time and effort they exact from their oppo-

nents." *Perkins v. New Orleans Athletic Club,* 429 F.Supp. 661, 667 (E.D.La.1976.).

Third, the record indicates that plaintiff in fact had difficulty finding an attorney to take this case. The ACLU refused to take the case when plaintiff requested assistance, because there were no issues with great societal impact. (*Id.* at 90). Venice Legal Aid rejected the case because it involved a potential recovery of damages. Thus, the services of the *pro bono* bar were simply unavailable to the plaintiff. The record further indicates that plaintiff consulted with the Jacoby & Meyers clinic, but they also did not take the case. Much of the private bar was off limits, because plaintiff could not afford to pay an hourly fee. While it is true that plaintiff's attorney Murdock was the first private sector lawyer offered the case, that is of little relevance in determining the market for this lawsuit. This case was referred to Mr. Murdock by the Venice Legal Aid office, which was familiar with his work in a similar civil rights case. In this type of referral situation, it is impossible to tell how many lawyers would have declined to take the case. Indeed, the trial court record in a similar case handled by Mr. Murdock showed that ten lawyers refused to take that case before Mr. Murdock finally accepted it. *See, Clark v. City of Los Angeles,* 803 F.2d 987 (9th Cir.1986).

The fee agreement in this case did not mitigate the risk of non-payment. The fee agreement was purely contingent, except for payment of $1,000.00 at the beginning stages of the lawsuit. The client was responsible for all costs of pressing the claim and litigating the suit. The record shows that counsel has received as of now only minimal payments from the client, and that the client even had trouble covering essential expenses. (Transcript on Appeal at 90). The agreement did not provide that the client guarantee payment for any of the lodestar. This is a classic case where the promise of even low returns is low and the risk on non-payment for most hours worked is high. Plaintiff's status as sole practitioner compounded the risk, because the case has precluded him from undertaking other paying employment.

Moreover, the delay in payment in this case is high. The record shows that plaintiff's counsel experienced cash-flow problems throughout the litigation and that he had to take out loans to himself and his family while he was working on this case. Thus, this case has not only been risky, but, as in the words of the district court in *Thompson,* it has been risky for a long time. Plaintiff's attorney has been litigating this case for almost 9 years, and he has yet to be compensated.

The court agrees with plaintiff's suggestion that there are not many in any profession who would be willing to work so long on a matter precluding acceptance of other paying work, and then assume the risk of being paid nothing unless a favorable result is achieved. With this record, this Court finds that a plaintiff in the position of Julie Chalmers faces exceptional difficulties finding a qualified attorney to accept such an arrangement.

Consequently, the court finds that the record includes sufficient support to grant an upward adjustment for the risk involved. The Court will award, for the reasons stated above, a 33% upward adjustment on the entire lodestar amount except that amount in 1983 associated with the attorney fee motion. *Clark v. City of Los Angeles,* 803 F.2d at 992 (Risk multiplier to increase the fees for fee-petition work an abuse of discretion.) Such an increase for risk finds support in the Ninth Circuit case law. *Id.* (33%); *Keith v. Volpe,* 501 F.Supp. 403, 414 (C.D.Cal.1980) (250% increase for contingency and quality). This amount also does not exceed the limits set in the *Delaware Valley* plurality opinion.

With the enhancement for risk, the total figure is calculated as follows.

| Year | Fee |
|---|---|
| 1978 | $ 2,026.16 |
| 1979 | $ 8,477.21 |
| 1980 | $25,283.67 |
| 1981 | $ 5,547.61 |
| 1982 | $17,728.90 |
| 1983 (unadjusted) | $ 5,250.00 |
| Total: | $64,313.55 |

### Enhancement based on delay

■ Although the courts have considered factors of delay and risk of non-payment under one general heading of contingency adjustment, adjusting for the former is a distinct issue from the latter. *Delaware Valley,* 107 S.Ct. at 3082. Plaintiff argues that the award should be adjusted upward for inflation and lost interest because there has been substantial delay in payment. This argument is logical and supported by the authorities that have considered the issue.

Plaintiff's argument rests on a sound economic premise. When litigation is protracted, as in the instant case, the value of services is less in dollar figures at the time they were performed than it would be calculated at current rates. However, had counsel been paid for those services when rendered, counsel would have had the use of that compensation in the interim and could have earned an adequate return on it. Moreover, inflation devalues any award based on outdated billing rates. For this reason, the courts which have considered this issue have historically granted an adjustment to reflect the loss suffered from the delay in payment. *See, e.g., Copeland v. Marshall,* 641 F.2d 880 (D.C.Cir.1980); *Burgess v. Premier Corp.,* 727 F.2d 826 (9th Cir.1984).

The Supreme Court in *Delaware Valley* recognized the necessity of a fee enhancement to compensate for delay in payment. The Supreme Court observed there that attorneys working under a contingent fee arrangement in a civil rights case are not paid until a favorable decision finally eventuates, which, as in the instant case, may be years after the work commences. The Court further acknowledged that the costs of doing business during the interim dry period continues and must be met. Accordingly, adjustments for delay, the Court concluded, are not inconsistent with the typical fee-shifting statute. *Id.* 107 S.Ct. at 3082.

■ While the courts uniformly have recognized the need to compensate for delay, they have disagreed regarding the proper methodology for implementing such an adjustment. The two alternatives offered are: (1) basing the award of fees billed in previous years on current billing rates; or (2) adjusting the lodestar fee based on historical rates to reflect the present value of the award. *See, e.g., Daly v. Hill,* 790 F.2d 1071 (4th Cir.1986) (Reversing the district court's attorney fee award in that case for failing to adjust for inflation and delay in payment, and remanding with the instruction that the district court "may increase the hourly rates to reflect current market rates, or it may increase the lodestar to counterbalance the effect of inflation and foregone interest on the value of the fee.").

A canvass of the attorney fee opinions suggests that the prevalent practice today seems to be the use of current rates rather than historical rates to compensate counsel for inflation and delay in receipt of payment. *See, e.g., Hirschey v. FERC,* 777 F.2d 1 (D.C.Cir.1985); *Burgess v. Premier Corp.,* 727 F.2d 826, 840–41 (9th Cir.1984). Courts have used the current rates approach because it roughly counterbalances the inflationary loss suffered by attorneys resulting from the long delay in recovery of their fees. *Chrapliwy v. Uniroyal, Inc.,* 509 F.Supp. 442, 457 (N.D.Ind.1981). In addition such an approach has been favored because it is straightforward and easily reviewed on appeal. *Institutionalized Juveniles v. Secretary of Public Welfare,* 758 F.2d 897, 923 n. 41 (3d Cir.1985).

These rationales for use of current rates to compensate for delay, however, are unpersuasive. First, current rates are an inaccurate measure of the effects of inflation on the fee. *Gaines v. Dogherty County Bd. of Education,* 775 F.2d 1565, 1572 (11th Cir.1985). An increase in an attorney's hourly rate over time more likely reflects an attorneys increased experience and skill as a lawyer than some change in the time-value of money. Where an attorney's increased hourly rates are attributable to that individual's increased value to clients, a comparison of a fee based on historical rates and a fee based on current rates has little relevance when assessing a delay in payment multiplier. *Institutionlized Juveniles,* 758 F.2d at 923. More-

over, a change in an attorney's fee schedule might reflect a change in the supply and demand of lawyers practicing in that attorney's field and community more than the effects of inflation. In addition, policy considerations indicate that to the extent historical rates were based on costs of overhead and services paid for at the time, adjustment by using current billing rates could result in a windfall for plaintiff's attorneys. A. Miller, *Attorney's Fees in Class Actions* (Federal Judicial Center 1980).

Second, even assuming that current rates properly account for loss owing to inflation, an adjustment based on the inflation rate improperly measures the true loss from delay. While adjustment for inflation might compensate for the decreased value of the fee paid several years after it is earned, it fails to compensate for the loss of use of that money throughout that period. The purpose of the delay adjustment is to ultimately award the attorney approximately that amount of money which he would have accumulated if he had been paid throughout the course of the litigation, not as here, about ten years later. The historic market rate of interest, which is in fact partly linked to the inflation rate, is a more relevant factor in measuring loss from delay. *Institutionalized Juveniles*, 758 F.2d at 923, n. 41; *Gaines*, 775 F.2d at 1572, n. 14 (Award of a figure which is recognized as representing the time value of money over the period of the litigation, and not simply the inflation rate, is the more accurate method for adjusting for delay in payment.).

While the adjusted historic billing rate approach is the more economically rational method, it is admittedly not the most convenient. Initially the court faces a hard choice in selecting an appropriate interest rate multiplier. Among the valid alternatives are: (1) the cost to plaintiff's counsel of borrowing funds to support himself during the non-paying phases of the litigation;

and (2) the cost of foregone interest on the money counsel would have accumulated if he had been paid throughout the lawsuit. Although either alternative would be acceptable here, the record in this case contains no data to support the use of the former alternative. The Court has access to the market interest rates for the period of this litigation. Since the court cannot begin to predict plaintiff's counsel's preference for risk, the Court finds that the interest rate on a risk-free investment such as United States Treasury Bills is the appropriate multiplier in this case. The interest rate on the fifty-two week Treasury Bill, rather than the the three or six month Treasury Bills, is appropriate, given Congress' expressed preference for that rate in the post-jugdment interest statute. Thus, while the current rate approach is more straightforward and less time-consuming than the historic rate approach, it is an economically improper methodology and therefore less preferable.

This court therefore employs the following formula to calculate the delay adjustment. First, the number of hours worked in the first year of the litigation is multiplied by the appropriate billing rate for that year. That product is then boosted by a risk multiplier discussed in the previous section. That subtotal is then increased by the percentage interest rate payable on 52–week U.S. Treasury Bills for the time work was done. The resulting interest total is then computed based on an estimate of the number of months in that year that interest was earned. Interest on the sum total of the fee earned compounded by the interest payable is then calculated for each remaining year of the litigation, and the process is repeated for every year in which fees were earned. Interest is also added for the period of non-payment after the judgment by the same formula. No post-judgment interest has been awarded.

The results as applied to this case are as follows:

| Year | Base Figure | Interest Rate | Cumulative Annual Total |
|------|-------------|---------------|-------------------------|
| 1978 | $ 2,026.16 | 7.21% | $ 2,111.38 |
| 1979 | $ 8,477.21 | 9.75% | $ 11,207.71 |
| 1980 | $25,283.67 | 10.89% | $ 39,088.59 |
| 1981 | $ 5,547.61 | 13.14% | $ 50,136.88 |
| 1982 | $17,728.90 | 11.07% | $ 74,397.22 |
| 1983 | $ 5,250.00 | 8.80% | $ 86,425.12 |
| 1984 | $ 0.00 | 9.92% | $ 94,998.49 |
| 1985 | $ 0.00 | 7.81% | $102,417.87 |
| 1986 | $ 0.00 | 6.08% | $108,644.88 |
| 1987 | $ 0.00 | 5.96% | $115,120.11 |

IT IS ORDERED that defendant City of Los Angeles pay attorney fees in the amount of $115,120.11. Payment is to be made to Plaintiff's attorney John B. Murdock by January 1, 1988.

IT IS FURTHER ORDERED that a copy of this order shall be served on counsel for plaintiff and defendant.