Selwyn A. ROBINSON, et al., Plaintiffs,

v.

George R. ARIYOSHI, et al.,
Defendants,

and

McBryde Sugar Co., Ltd., et
al., Defendants.

Civ. No. 74–32.

United States District Court,
D. Hawaii.

Jan. 18, 1989.

---

J. Garner Anthony, Alexander C. Marrack, Honolulu, Hawaii, for plaintiffs.

William F. Quinn and John J. Rapp, Honolulu, Hawaii, for Olokele Sugar Co., Ltd.

J. Russell Cades and Philip J. Leas, Honolulu, Hawaii, for McBryde Sugar Co., Ltd.

Corrinne K.A. Watanabe, Atty. Gen., Steven Michaels, Deputy Atty. Gen., and Paul D. Alston, Honolulu, Hawaii, for State Officials.

Robert B. Bunn, Honolulu, Hawaii, for Small Owners Ida Albarado, et al.

## ORDER ON McBRYDE'S MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS

PENCE, Senior District Judge.

Defendant and Cross–Claimant McBryde Sugar Co., Ltd. (McBryde), has again in 1988 moved this court for an award of attorneys' fees and costs actually paid by McBryde in and relevant to this present litigation, plus interest lost thereby. The motion is based upon the Civil Rights Attorneys' Fees Award Act of 1976, 42 U.S.C. § 1988 (1976). With the instant motion, of course, were additional exhibits, affidavits, and memoranda in support of the motion. The court will take judicial notice of the prior affidavits, exhibits, and records and files in this case as they may involve the problem of attorneys' fees and costs.

On October 29, 1985, McBryde filed a similar motion for attorneys' fees, etc., but before this court had ruled on that motion, the court of appeals vacated this court's 1977 decision in favor of McBryde and other plaintiffs. This court, therefore, was estopped from further consideration of that motion. On December 28, 1987, this court, on remand, re-entered judgment in favor of McBryde (and other plaintiffs), hence McBryde's re-filed motion for attorneys' fees, etc.

The attorneys' fees and costs sought by McBryde are the fees and costs McBryde actually paid prior to and including December 31, 1987 in connection with this litigation. The fees requested by McBryde were incurred for proceedings in:

1. The Supreme Court of the State of Hawaii in McBryde's attempt, in 1973, to obtain a re-hearing and an evidentiary hearing on its constitutional claims evolving from that court's ruling in January 1973 in *McBryde Sugar Company v. Robinson*, 54 Haw. 174, 504 P.2d 1330 (*McBryde I*) that the "State is the owner of all the water" in the Hanapepe River, that the English commonlaw doctrine of riparian rights governs the use of Hawaii's stream waters, and that neither McBryde, the Small Owners, nor any of the other plaintiffs could transport water out of the watershed.

2. The United States Supreme Court on the Petition for Certiorari in 1974.

3. This court, in proceedings from 1974 through 1977.

4. The Ninth Circuit Court of Appeals, in appellate proceedings from 1977 through 1985.

5. The Supreme Court of Hawaii, in proceedings on the certified questions from the Ninth Circuit Court of Appeals from 1981 through 1983.

6. This court, in proceedings on its first remand from 1985 through 1986.

7. The Ninth Circuit Court of Appeals, in proceedings on appeal of this court's judgment after remand.

8. The United States Supreme Court, in the proceedings on State Officials' Petition for Certiorari.

9. The Ninth Circuit Court of Appeals in proceedings on remand from The Court.

10. This court, in proceedings on remand from the Ninth Circuit Court of Appeals, and

11. This court, in proceedings on the original application for attorneys' fees in 1985.

The attorneys' fees sought by McBryde in the instant motion also included fees paid by McBryde on behalf of the Small

Owners, Ida Albarado, et al., as well as McBryde's portion of the fees paid by the Hawaiian Sugar Planters' Association in support of all plaintiffs involved in this litigation. The total fees that McBryde has actually paid and set forth in Exhibit B of its Motion for Award of Attorneys' Fees of April 14, 1988 are $1,198,301.29. In addition, McBryde requests an upward adjustment of those fees to compensate McBryde for delay in repayment thereof by the State. McBryde asked this court to award compensation for delay in payment by either of two alternate methods. First, McBryde asked that it be awarded $1,051,-805.09 as lost interest on fees and costs actually paid by McBryde (as calculated in Exhibit A of McBryde's Supplemental Exhibit of June 3, 1988) and based upon McBryde's parent corporation's actual average investment rate of return for the years that fees were paid. The total award requested (June 3, 1988), adjusted for delay of payment by this method, totals $2,250,-106.38. McBryde sets forth that this represents the actual cost and lost income as of December 31, 1988 experienced by McBryde as a result of payment of attorneys' fees and costs over the years since 1973 and through December 31, 1987.

Second, as an alternative to the above method of compensating McBryde, McBryde requests this court to award fees based upon the *current* hourly rates for attorneys and sets forth the basis for that calculation in Exhibit C. The resulting requested fee award under this method would be $1,948,032.72. McBryde asked this court that the award based on current hourly rates be effective only if the appellate court determines that the State Officials have no obligation to pay interest.

Finally, in addition to the upward adjustment to the fees actually paid in order to compensate for delays in payment, McBryde requests a further upward adjustment for:

1. The amount of time spent by McBryde's attorneys on the litigation and not billed to McBryde, and

2. The relentless litigious actions of the State Officials in their unremitting attempt to sustain the ruling of the Supreme Court and keep, for the State, the virtually absolute and almost untrammelled control over all of the flowing waters in the State of Hawaii.

The initial reaction of anyone, not thoroughly familiar with the political background behind the above-referred-to opinion of the Supreme Court of the State of Hawaii, in 1973, in *McBryde v. Robinson,* as well as the history of the movements of this litigation up and down through the Hawaii Supreme Court, this United States District Court, the Circuit Court of Appeals, and The Supreme Court of the United States, when presented with a claim on the part of the attorneys for McBryde and the owners of small parcels of land and water rights that McBryde should be repaid over $2 million for attorneys' fees, costs, and losses it has paid and suffered, might well be that any such request is outrageous. The position of the Attorney General's Office of the State of Hawaii is that McBryde's claim for those fees, costs, and losses should, in part, be entirely denied and the remainder drastically cut. This position, on the part of the *present* Attorney General of the State of Hawaii, might, charitably, be excused because he inherited this case from his politicized predecessors in office. Nevertheless, it must be remembered that Hawaii's Governor Waihee, who appointed the present Attorney General, became Governor through the support of the political machine built up by former Governor Burns and preserved and continued by Governor Ariyoshi.[1]

The casual observer would not know that on January 10, 1973, the "Richardson Court" (which, on December 20, 1973 became a 3–2 majority), headed by Chief Jus-

---

**1.** In its Order of August 22, 1988, 854 F.2d 1189 the court of appeals observed:

The plaintiffs have moved to restrict the issues upon this appeal to the scope of the

Supreme Court's remand. The motion should not be necessary, but *the State defendants apparently have endless time and energy* (emphasis added).

tice Richardson and Justice Abe, and without any warning to any of the parties in the water rights case, Robinson, McBryde, Olokele, the Small Owners, and the State, in the appeal before it, had decided, sua sponte, that it was going to change all of the laws regarding flowing waters in the State of Hawaii and take away from the plaintiffs all claims to water from the mountain streams, give ownership of the waters to the State, and give to any owner of riparian soil along a stream the absolute right to see that fresh water stream flow, undiminished by any diversion of the waters thereof, past his land, his *kuleana,* down to the sea and become salted. By also holding that there could be no diversion of waters out of the watershed, Justices Richardson and Abe, in implementing their own political philosophy—some have likened it to that of Robin Hood—of taking the property of big business entities and giving it to the people of the State, without paying them for that property, completely overlooked the impact of that decision upon not only the sugar plantation plaintiffs, but also the Small Owners in this case, some of whom had leases from the State which *mandated* that they use water diverted out of the watershed to irrigate their vegetable market crops or lose the leases. Those Justices also overlooked the impact of their decision on the Board of Water Supply of this county of Honolulu, which had purchased, some by way of condemnation, water rights, and was diverting water out of various watersheds in order to supply water to all the inhabitants of Honolulu. Those Justices apparently were oblivious to the obvious fact that the implementation of their opinion would mean that all of the sugar plantations on Kauai, on Oahu, on Maui, and some on the Big Island, would be forced instantly to close down and go out of business—throwing thousands of workers out of jobs.

All of those almost catastrophic evils should have been instantly apparent to the Attorney General of the State of Hawaii back in 1973. It should have been even more apparent to the successive Attorney Generals thereafter. However, the attitude of the Attorney General of the State of Hawaii on January 10, 1973, when, by the ukase and fiat of Justices Richardson and Abe, the water rights of Robinson, McBryde, Olokele, and the Small Owners were, without warning, expropriated, taken away from them and, forthwith, given to the State of Hawaii, was, in effect, one of instant glee and rejoicing. Greedily, the Attorney General of the Burns administration not only accepted this unconstitutionally expropriated (judicially "stolen") property, but thereafter, he and his successors have fought, relentlessly, through all courts to keep it.

As a result of the attitude of the Attorney Generals of Hawaii during the 15 years this case has been in litigation, McBryde, Robinson, Olokele, and the Small Owners have been forced to fight unceasingly for their very economic lives. The monies that McBryde, Robinson, Olokele, and the Small Owners have paid out for attorneys' fees, of necessity were paid out for the purpose of sheer survival. This court has no sympathy for the position taken by the present, as well as the prior Attorney Generals. The State's Attorney Generals could have, at any time over the years after 1973, refused to take the "judicially stolen" water, could have made it clear that they felt the taking of those water rights was constitutionally unlawful, could have openly and publicly rejected as unconstitutional the position taken by Richardson and Abe—as did two other Justices, Marumoto and Levinson—and avoided all of the 15 years of litigation that has followed.

The State itself has paid out untold hundreds of thousands of dollars in attorneys' fees, costs, and expenses.[2] While this court has no underlying sympathy for the State's actions in this case, this court will, nevertheless, analyze carefully all the objections that have been made by the State to McBryde's claims, and will rule as this

---

**2.** As noted during argument of this motion, the State has objected to the hiring of special counsel by the plaintiffs even though the State itself has paid for experts and special attorneys, including the filing briefs "as Amicus" for Chief Justice Richardson.

court views the facts and law applicable to plaintiffs' motion.

## I. DELAY IN FILING FEE APPLICATION

■ At the very outset, defendants claimed that McBryde has waived its right to seek fees and costs for any work done prior to the commencement of the Ninth Circuit proceedings in March 1978 by failing to apply for those fees in a timely manner. As the defendants point out, the Civil Rights Attorneys' Fees Award Act became law in 1976. It was made applicable to all cases that were pending on the date of its enactment, October 18, 1976. The instant case in this federal court was filed on February 14, 1974, with trial in April 1976, and a decision thereon on October 26, 1977, 441 F.Supp. 559, with final judgment entered on March 2, 1978.

McBryde has asked for all attorneys' fees, costs, etc., commencing with the issuance of the Supreme Court of Hawaii's decision in *McBryde I* in January 1973, and continuing up to December 31, 1987. The State first maintains that McBryde is entitled to nothing for the payments it made to its attorneys prior to this court's judgment of March 2, 1978, maintaining that McBryde's fee application has been filed so late that the passage of time constitutes laches and precludes them from seeking fees for any portion of the case prior to March 1978. In support of this contention, the State points out that this court's final decree came over 16 months after Civil Rights Attorneys Fees Awards Act became law, but at that time McBryde did nothing to assert any entitlement to fees and continued to do nothing relative to the same until seven and one-half years after this court's judgment of March 1978 had established their rights.

As the record shows, McBryde filed a previous Motion for Attorneys' Fees on October 29, 1985. In 1986, this court, after all parties had filed their various responses, was forced to conclude its consideration of that application when The Supreme Court granted certiorari and remanded the case to the Ninth Circuit for reconsidera-

tion in light of *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), and, thereafter, the court of appeals vacated this court's 1977 decision and remanded the case to this court to "reconsider" its judgment as per The Supreme Court's remand. It was after this court, on remand, re-entered judgment in McBryde's favor on December 28, 1987, that McBryde re-filed its Motion for Attorneys' Fees.

In support of its claim that McBryde's application for fees and costs prior to 1978 was untimely, the State has filed a multitude of cases in State's May 2, 1986 Memorandum in Opposition, at pp. 7–15, and State's May 30, 1986 Answering Memorandum in Opposition, at pp. 4–10 (1986). It primarily has based its contentions on *Baird v. Bellotti*, 724 F.2d 1032 (First Circuit), *cert. denied*, 467 U.S. 1227, 104 S.Ct. 2680, 81 L.Ed.2d 875 (1984), maintaining that a fee application made after unreasonable delay after entry of judgment with resulting prejudice to the defendants cannot be allowed. The State maintains that the unreasonable delay had resulted in demonstrable prejudice to the State.

In *Baird, supra,* the plaintiff filed a fee application in 1982 seeking fees for a case commenced in 1974 and finally decided in 1979, i.e., a fee application was filed 30 months after the Supreme Court had denied rehearing. In *Baird, supra,* Judge Aldrich held that a 30–month delay was "plainly unreasonable." However, there was a finality of judgment in *Baird* that has never been present in this case. Even as late as this court's 1987 hearing on remand, the State Officials argued that every issue in the case was again open for reconsideration. Thus, it is unlike *Baird* and other cases cited by the State, viz., *Fulps v. City of Springfield*, 715 F.2d 1088 (6th Cir.1983) and *Sellars v. Local 1598*, 638 F.Supp. 507 (E.D.Pa.1986), *aff'd* 810 F.2d 1164 (3rd Cir.1987), where the fee applications were filed *after the entire litigation had terminated.*

As the plaintiffs point out, while other circuits may have considered the problem

and ruled thereon, until the Ninth Circuit, in 1983, decided *Masalosalo v. Stonewall Ins. Inc.*, 718 F.2d 955 (9th Cir.1983), this court had no jurisdiction over fee applications during the pendency of an appeal. That rule of the Ninth Circuit was indicated in *G & M Inc. v. Newbern*, 488 F.2d 742 (9th Cir.1973). Thus, since the State immediately appealed this court's 1978 judgment, this court would then have had no jurisdiction over any application by McBryde for allowance of attorneys' fees. *See Bionic Auto Parts and Sales, Inc. v. Fahner*, 588 F.Supp. 84, 86, and pt. 5 (N.D. Ill.1984).

Apart from the above, it would appear that McBryde's application was submitted within a reasonable time under the authority of *White v. New Hampshire Dep't. of Employ. Sec.*, 455 U.S. 445, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982). Here, the plaintiffs and defendants have been in intensive and persistent ongoing litigation since the Hawaii Supreme Court's opinion in *McBryde I, supra*, in 1973, and that litigation is still ongoing. Not dissimilar is the holding of *Brewster v. Dukakis*, 544 F.Supp. 1069, 1073 (D.Mass.1982) where that court rejected a claim of laches:

> This argument might carry weight if the litigation had indeed ended on December 7, 1978. However, the plaintiffs and defendants have had an intimate and unbroken relationship since 1976. Despite the Consent Decree, in essential respects, the negotiations, monitoring and litigation have unfolded continuously from the initiation of the suit to the present ... The Court finds that the defendants have not suffered any significant prejudice as a result of the timing of filing the attorney's application.

*See also Perry v. O'Donnell*, 759 F.2d 702 (9th Cir.1985).

As pointed out in *White* 455 U.S. at 454, 102 S.Ct. at 1167–68, "Section 1988 authorizes the award of attorney's fees 'in [the] discretion' of the court. We believe that this discretion will support a denial of fees in cases in which a post-judgment motion unfairly surprises or prejudices the affected party."

While the defendants have not and could not express surprise at McBryde's motion for recovery of fees paid, they have maintained that they have been prejudiced by McBryde's delay in filing its motion. Defendants maintain "the delay here was so long that a finding of prejudice should follow from its length alone." State of Hawaii's Memorandum in Opposition filed May 2, 1986, p. 12, citing *Baird, supra.* The State maintains that it has been more than 13 years since the beginning of the dispute. The State maintains that because so much time has elapsed, "the State's ability accurately to reconstruct the events before and at trial has been prejudiced by the retirement of Andrew Lee, the deputy attorney general who was lead counsel for the State defendants throughout the case." The State also asserts that "the HSPA and Kauai Council for the Small Owners have all lost or discarded their 1973 and/or 1974 time records." The State's third claim of actual prejudice is that "the loss of the court's memory is likely to be particularly harmful to the defendant, again citing *Baird, supra.*[3]

Andrew Lee, Deputy Attorney General, who initially was in charge of this litigation, has retired, but the court will take judicial notice that he is not dead, and nowhere in the record does it appear that the present counsel, in the evaluation of McBryde's claims, has found it necessary to ask for Mr. Lee's help. The State's claim of prejudice because of this factor appears to this court more verbal than real.

---

**3.** Because in its bills to McBryde attorney Cades had listed some three short telephone calls to Judge Pence over the years concerning which neither attorney Cades nor Judge Pence could remember what was discussed, the State argues that this court, ergo, could not be expected to remember proceedings that occurred 8 to 12 years ago. Neither a judge nor an attorney is expected to remember the essence of each and

every telephone call that he may make over the years, but it does not follow therefrom that the important details of any particular litigation are similarly lost from memory. This judge does not feel that his memory of the important details of this case and the legal work demanded of McBryde's counsel has been impaired, other than superficially.

The mere exhortation of prejudice is not sufficient. The review of the fee application, no matter what judge is reviewing it, is based upon the application itself.

The fact that the Kauai attorney for the Small Owners has not kept his own records is minimal prejudice. McBryde has its own record of what it paid to that attorney for the services which were rendered.

As the district court in *Baird v. Bellotti*, 616 F.Supp. 6, 9 (D.Mass.1984) said,

> While defendants claim prejudice because of PPLM's delay they point to no specifics to support their assertion. Moreover, the detailed response they ultimately filed belies their allegation.

This court notes that the State's response falls into the category of "hyper-detailed."

In its May 9, 1988, Memorandum in Opposition, the State claims additional prejudice. After referring to the fact that its witnesses have retired or lost recollection and the court's memory may have faded, on page 6 the State blandly says: "This prejudice can only have been exacerbated by the additional two years that have passed since McBryde filed its original [1986] memorandum". Tommyrot!

As the voluminous record in this case shows, in many ways it might be denominated as a "paper" case. Prior to every hearing before this court, reams of argument were filed by both the plaintiffs and the defendants. There were no depositions of very great import taken. There were relatively few court appearances. The trial itself only took two days. Practically everything that has occurred in this case was set down in writing and can be scrutinized today, as well as it was 15 years ago. This includes all of the filings with the Hawaii Supreme Court, the Ninth Circuit Court of Appeals, and the United States District Court.

The time records kept by Cades, Schutte, Fleming and Wright ("CSF & W"), McBryde's attorneys, were submitted monthly to McBryde and, therefore, were necessarily detailed. They were so well kept that, as Exhibits A through M of the State's opposition memorandum of May 2, 1986 well illustrate,[4] the State was able to cull from the time records what the State claimed were illustrations of the multitude of reasons why McBryde should be allowed only a fraction of what it actually paid out in fees. If, as the State argued, counsel and court's memory has "faded", nevertheless, this court is able to make a full and complete review of McBryde's claim.

This court finds that the State's claim of prejudice is more hypothetical than real. This court will review and decide upon the reasonableness of McBryde's claim for fees, for services rendered, and costs incurred prior to March 1978, along with those incurred after that date.

## II. ANALYSIS OF FEES CHARGED

In *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (1975), the Ninth Circuit adopted the guidelines set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974) "as appropriate factors to be considered in the balancing process required in a determination of reasonable attorneys' fees." This court, in its evaluation of the fees paid by McBryde, finds that:

1. The time and labor required by McBryde's attorneys as well as costs and expenses are fully set forth in the plaintiffs' ten-inch-high 1985 Motion, with exhibits, for an award of fees, and augmented by its 1988 Motion.

2. As heretofore indicated, the opinion of the Hawaii Supreme Court, in *McBryde I*, completely upset and set aside established law regarding the ownership of water and water rights in Hawaii and, as the remand of this case from The Supreme Court in 1987 shows, the State has attempted to put legal roadblocks at never-ending intervals in order to defeat plaintiffs' claims of unconstitutional taking of their water and water rights.

3. As heretofore indicated, the Hawaii Supreme Court's decision in *McBryde I*, if not overturned, sounded the death knell for McBryde and other plaintiffs and foretold

---

**4.** Those exhibits use up over a one inch stack of paper sheets.

bankruptcy for many of the Small Owners. It was imperative that McBryde have attorneys who, from its own observation and experience, were what McBryde considered as the highest and best qualified persons to save the company from extinction. This demanded employment of the most experienced lead counsel and highly experienced associate counsel to be found in Hawaii, as well as experts in the field, in order to save McBryde from total destruction.

4. While the water rights cases have not demanded exclusive use of counsels' time for the entire 15 years of this litigation, nevertheless, sporadically, as problems and issues came to an intense focus—e.g., immediately after *McBryde I;* suit in this court in 1974 and the 1976 hearing; the appellate briefs; the hearing on the questions submitted by the Ninth Circuit to the Hawaii Supreme Court and subsequent appellate briefing; the remand to this court; the subsequent appeal; the problems after granting of certiorari by The Supreme Court; then the remand thereafter to the court of appeals; the hearing on reconsideration in this court; and, last but not least in this court, the 1985 and 1988 *motions for attorneys' fees paid by McBryde*—McBryde's attorneys have had to give full time and energy to handling McBryde's problems.[5]

5. The record shows that the fees charged by CSF & W were normally and regularly charged to McBryde as a large, old, and valued client.

6. Here, CSF & W's fees were not fixed or contingent. When CSF & W submitted its regular monthly billings to McBryde, after review and, at times, downward adjustment, McBryde paid for the services rendered. This, therefore, is not the situation where the attorney wants to get paid. Here, the client seeks reimbursement for all of its losses brought about by the State's insistence on keeping the "judicially stolen" water.

7. The only time limitations were those imposed by the rules of court. The only limiting circumstances were those acts on the part of the State practically from the beginning, which led the plaintiffs to believe the State would immediately take steps to enforce the ownership of the waters given to the State by the Hawaii Supreme Court. This demanded an almost immediate injunctive proceeding. If, in 1976, the State had taken the stand in this court that it subsequently did on appeal, viz., representing to the court of appeals that it had not (it could not without violating this court's injunction) and would not take any steps to enforce its claim of ownership of all the waters until after the final disposition of the case, it would not have been necessary for this court to have issued an injunction.

8. As a result of the action taken by McBryde's counsel, the State was restrained from implementing its claim of ownership of all the waters and, until The Supreme Court granted certiorari and then remanded the case, it was believed by the judges of the Ninth Circuit, as well as this judge, that the plaintiffs had won and were vindicated in their claim that the holding in *McBryde I* unconstitutionally violated McBryde's rights. As previously indicated, millions of dollars invested in land, machinery, mills, ditches, and equipment, as well as the employment of thousands of workers, were at stake in this case.

9. CSF & W is recognized as one of the finest law firms in Hawaii. Senior partner J. Russell Cades, who has practiced in Hawaii since 1929, always with the same firm, has long been recognized as the dean of the Hawaii Bar. This court, having had the lead and associate counsel in this case before it in this and other cases, recognizes that each is recognized as an attorney of sound judgment and outstanding ability.

10. The basic undesirableness of this case was that the Richardson Court, i.e., Justices Richardson and Abe, took any attack upon this case as a personal affront. This is illustrated by the fact that Chief Justice Richardson hired special counsel (paid for, of course, by the State, but, nevertheless, hired by Chief Justice Richardson) to appear specially for the Supreme

---

**5.** See State of Hawaii's Memorandum in Opposition, dated May 2, 1986, Exhibit A.

Court before the court of appeals in this case.

11. As the record shows, McBryde has employed the firm of CSF & W as its primary attorneys since 1960 and still continues to so employ the firm.

12. This court has never had a case before it that can be described as truly "similar". McBryde did not ask for damages; McBryde paid its attorneys regularly; all that McBryde wanted was to save its own life.

In this decision, as will appear, this court persistently and insistently has taken into consideration the preceding guidelines.

As The Court said in *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983), in discussing attorneys' fees under 42 U.S.C. § 1988,

"[T]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly."

The Court continued,

The district court also should exclude from this initial fee calculation hours that were not "reasonably expended." Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary*.... [emphasis in original]"

The Court also said, on p. 447, 103 S.Ct. on p. 1947:

[J]udges awarding fees must make certain that attorneys are paid the full value that their efforts would receive on the open market....

*Ohio–Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 776 F.2d 646, 664, n. 18 (7th Cir.1985), "Statement of annual fees paid by Ohio–Sealy to its lawyers in 1971 would reflect not only the then-prevailing market rates but also the lawyer's billing judgment. See *Hensley* 461 U.S. at 434 [103 S.Ct. at 1939]."

McBryde here has requested no more than the fees of CSF & W which McBryde's in-house counsel reviewed and either authorized payment in full, or made certain deductions and paid less than the billing, monthly. McBryde paid that firm full market value for the services rendered, as McBryde viewed that market value. CSF & W has a host of lawyers in its firm. Here, their charges were made in private practice to a valued client. The firm was ethically obligated to exclude any excessive, redundant, or otherwise unnecessary hours from the fee request they submitted to McBryde for payment. It fulfilled that obligation to McBryde, as is fully and completely set forth in the 650 pages of minutely detailed time records contained in the billing sheets for all of the hours claimed and filed as an exhibit in this application for fees.

■ The State has attacked the hourly rates of McBryde's chief attorneys as "unreasonable," "out of line," "unjustifiable," and "excessive."

| Attorney | Years in Practice | Years Worked Performed | Rates Requested |
|---|---|---|---|
| Cades | 59 | 1973–87 | $100–225 |
| Bunn | 26 | 1973–87 | $ 75–160 |
| Scearce | 17 | 1973–85 | $ 60–150 |
| Leas | 13 | 1974–87 | $ 40–155 |
| Gabrio | 6 | 1982–87 | $ 60–120 |

This judge, in his 27 years as a district judge, has reviewed scores of requests for attorneys' fees, and, as the State's present lead counsel, Alston, knows, has reviewed that firm's requests for fees in other cases,

some as recently as July 18, 1988,[6] and has not hesitated to lower or raise the requested fees. This court also notes that in 1984, 1985, and 1986 attorney Alston was charging $150 an hour; in 1987–87, $175.00 an hour. In *All Hawaii Tours v. Polynesian Cultural Center*, 116 F.R.D. 645 (D.Hawaii 1987), this court awarded $150 per hour to two attorneys with the same range of experience as attorneys Leas and Gabrio. In *Palila v. Dept. of Land and Natural Resources*, 118 F.R.D. 125 (D.Hawaii 1987), Judge King awarded all fees requested by members of Alston's firm. On pp. 13 and 14 of the *Palila* memorandum filed by Alston's firm is a list of other Civil Rights cases in the Ninth Circuit and other circuits where the awarded hourly rates ranged from $150 per hour for work performed in 1983, and $230 an hour for work performed in 1985. With the *Palila* memo was also an affidavit by Hawaii attorney John Edmunds to the effect that attorneys with 20 years' experience in Hawaii were charging $150–$250 per hour. Another Hawaii attorney, Robert Thum, stated that Hawaii attorneys with 18–20 years' experience were charging $125–$150 an hour. This court finds no merit in the State's objections to the rates charged by the attorneys of the CSF & W firm. This court also finds that the fees charged McBryde were at all times reasonable.

The State, nevertheless, maintains that the 15% reduction in McBryde's claim should be made because of the "vague and incomplete descriptions in the records." It would appear that the State has made an exhaustive (and exhausting) analysis of almost every single item in McBryde's entire claim.[7] As shown in Exhibit I of the State's May 2, 1986 Memorandum in Opposition, the State has made a detailed analysis of 738 telephone calls between counsel for the various plaintiffs (i.e., including Olokele and Robinson), and in Exhibit J has listed 1,053 intra-office conferences and telephone calls of CSF & W's firm and noted that 1,085.75 hours were billed, but

because many of the entries did not state the subject or the time consumed on the calls, insists that McBryde should be paid only 674.4 hours for the same.

This court notes that in the *Palila* case, *supra*, Sherwood, one of the plaintiff's attorneys, had 62 entries, 22 of which would be "vague and indefinite", as those terms are here construed by the State. Likewise, Mr. Alston and his partner, Mr. Hunt, had 26 entries, 22 of which would have been stricken under the State's present standards. Nevertheless, Judge King awarded *all* of that time stating, "The evidence submitted by the plaintiffs adequately support their claims for 809.8 hours as reasonable." 118 F.R.D. at 127.

The State also requests that 25% of McBryde's claim be slashed because of duplication of effort, again counting the number of conferences and telephone calls.

In a case of this magnitude and importance to McBryde, McBryde's attorneys would have failed in their ethical obligation to their client if there had not been many and persistent conferences between lead counsel to make sure that every avenue of law and fact were searched, researched, and reviewed to make sure there was no hole, loophole, or pinhole through which the State might escape with its ill-gotten water. The State insistently overlooks what this court has repeated many times since 1976 —that the very existence of McBryde and many other plaintiffs depended upon the outcome of the instant litigation. For McBryde's attorneys not to have conferred often would have constituted a gross dereliction of their duty to their clients.

The State maintains that McBryde is not entitled to any recovery for any fees paid for which CSF & W identified only "vaguely and inadequately." The State maintains that timesheet entries, such as "research," "trial preparation," "conferences," and "correspondence," when entered alone or with only the names or initials of other persons, are too vague to provide any basis for determination that such hours were

---

6. *In re WPMK Corp., Inc.,* Bk. # 81–00424 and *In re Paradise Palms Vacation Club,* Bk. # 81–00724.

7. See again the last half of the second sentence in note 1, *supra.*

reasonably expended. On p. 19(a) and (b) of State's May 2, 1986 Memorandum in Opposition, the State well illustrates the hours it has spent in searching for minutiae in the 650 pages of billing records filed by McBryde. Those two pages overlook the quotation from *Spell v. McDaniel*, 616 F.Supp. 1069, 1086 (E.D.N.C.1985) set out by the defendant on its preceding page 18:

> "Although it is not necessary to know "the exact number of minutes spent nor the precise activity to which each hour was devoted," the fee application must contain sufficient detail to permit the court and opposing counsel to conduct an informed appraisal of the *merits of the application* [emphasis added]."

As the *Lindy* court, in *Lindy Bros. Builders, Inc. v. American Radiator, etc.*, 540 F.2d 102 (3d Cir.1976) observed, p. 106, it is not intended "that a district court, in setting an attorney's fee, become enmeshed in a meticulous analysis of every detailed facet of the professional representation." It is not intended "that the inquiry into the adequacy of the fee assume massive proportions, perhaps dwarfing the case in chief. Once the district court determines the reasonable hourly rates to be applied, for example, it need not conduct a minute evaluation of each phase or category of counsel's work." *See also Copeland v. Marshall*, 641 F.2d 880 (D.C.Cir.1980), p. 903, and *Ohio–Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 776 F.2d 646 (7th Cir.1985), p. 657–58:

> "The record in this case contains pages and pages of computer printouts describing how attorneys and paralegals spent their time—down to the quarter hour. In the district court, Sealy identified 978.-25 hours of Mr. Brace's time that Sealy thought was either unrelated to the litigation or had too vague an entry. These 978.25 hours came from 475 different entries, some accounting for only fifteen or thirty minutes. Assuming that fifteen percent of the time was inadequately described, identifying each value or undeci-

pherable entry would take hours and hours of the court's time and require an order nearly as voluminous as the evidence. For a case of this size, we agree with the District of Columbia Circuit that an item-by-item accounting would be neither practical nor desirable",

citing *Copeland, supra.*

Neither this judge nor his staff have gone over each and every one of the some 20,000 time entries CSF & W *had billed* to McBryde over the last 15 years. From this court's view, review, and overview of the time records of CSF & W, as *billed to and paid by McBryde*, this court finds that the number of "vague and indefinite entries" and time entries with no description are relatively miniscule, and do not, in the least, inhibit this court's determination that CSF & W's billing records do *not* deserve a percentage reduction because of vaguesness, etc. Instead, this court finds that, overall, the time, as billed, reflects the necessary and reasonable work of McBryde's attorneys in this case.[8]

## III. SMALL OWNERS

McBryde seeks to recover attorneys' fees and costs it paid in providing representation to the Small Owners. The State's position is that no fees or costs should be awarded for the representation and costs provided to the Small Owners because "(1) they filed no application, (2) they had no counsel, and (3) the work done on their behalf was unnecessary and duplicative".

It appears that in the basic litigation before the Kauai Water Commissioner the Small Owners were not represented by Kauai attorney Clinton Shiraishi, who then was a sole practitioner on Kauai.[9] The Small Owners were satisfied with the volume of water per acre allotted to them in the decision of Circuit Judge Tashiro (Water Commissioner), and, like Olokele, did not note an appeal therefrom. It was not until the Supreme Court rendered its opin-

---

**8.** This finding does not preclude this court's analysis and determination hereafter of whether or not certain of CSF & W's work areas and billings therefor should be paid by the State.

**9.** Kauai then had a population of about 30,000 (1970 census).

ion in *McBryde I* that it became necessary for the Small Owners to join with McBryde, Robinson, and Olokele to attempt to reverse the new law of waters set out therein. Then they hired Shiraishi to represent them, post *McBryde I*, in their forced appeal to the Hawaii Supreme Court.

By *McBryde I*, the Small Owners were divested of any water rights whatsoever and the opportunity to exchange the water rights of one acre of land for two acres without such rights was taken away. Likewise, as indicated heretofore, some Small Owners farming dry land leased from the State would violate their leases and be forced out of business if they could not secure water diverted out of its watershed. Shiraishi's fee on appeal was $2,700 plus $162.81 in expenses, for a total of $2,862.81. This bill was subsequently paid by McBryde. (See Affidavit of R. Dougal Crowe, dated October 28, 1985, and Exhibit B attached in McBryde's 1985 Motion for Attorneys' Fees.)

In August of 1973, attorney Robert Bunn of the CSF & W firm offered to represent the Small Owners at no cost to them, all attorneys' fees to be paid by McBryde. This was satisfactory to the Small Owners. It was finally agreed that Shiraishi would continue to represent the interests of the Small Owners with Bunn, as co-counsel, actually doing such work as was necessary, with all fees and costs to Shiraishi's clients being paid by McBryde.

The State maintains that "The participation of the Small Owners contributed nothing substantive to the case." [10] The State maintains that the rights of the Small Owners "may have been affected in theory but they were indistinguishable from, and they were amply protected by, the primary litigants." [11] The State also maintains that McBryde should not be repaid because any claim for fees would belong to the Small Owners, and the Small Owners are not asking for any compensation, therefore

McBryde cannot recover anything for the money it paid out on behalf of representation of the Small Owners. The State's third objection is that the result of the representation of Shiraishi and Bunn on behalf of the Small Owners "was only to increase unreasonably the fees incurred." [12] It is the State's position that there was no reason why McBryde and the Small Owners needed separate counsel, briefing, and argument inasmuch as "their interests were so closely aligned." [13] The State urges that the Small Owners "could have participated less actively or watched from the sidelines without risk." [14]

The State insists that because McBryde could not pinpoint the exact number of hours that Bunn, as well as CSF & W, spent in representing the Small Owners, separate and apart from that time spent representing McBryde's own interests, McBryde's total fee claim should be reduced 25% (of the time devoted by CSF & W), plus the $2,990.81 paid to Shiraishi. The State pointed out that it found that Bunn had spent over 1500 hours on the case, and that out of the $57,200 billed by CSF & W in April 1974 for proceedings in the U.S. Supreme Court, 29% of that amount ($13,500) was allocated to the preparation of papers filed in the name of the Small Owners.[15]

The general thrust of the State's position is that the Small Owners should never have had any representation, that even their presence in the post *McBryde I* hearings and litigation was unnecessary because, so says the State, their interests were the same as those of the plantations and it was not necessary for them to appear in the subsequent litigation. The State's position is preposterous. As indicated above, the Small Owners had not appealed and, therefore, their plight was not before the Supreme Court prior to *McBryde I*. All that the Supreme Court had then before it were

10. State's 1986 Memorandum in Opposition, p. 22.

11. Id.

12. Id. at 24.

13. Id. at 26.

14. Id. at 27.

15. Id. at 29.

the BIG plantations, i.e., McBryde and Robinson. It would appear that the underlying desire of the Richardson Court was to take from the large plantations and give to the people of the State. If the Small Owners had appealed, perforce, it should have been apparent even to the Richardson Court that the Small Owners, the little farmers too, were going to be smashed by the court's opinion. If the Small Owners had been before that court, it might have been able to appreciate that its opinion injured not just the big and rich, but also the small and poor. Without the presence of the Small Owners in this litigation, the overall perspectives, dimensions, and ramifications of the *McBryde I* opinion could not be made apparent to all—including this court, the court of appeals, and The Court.

The small farmers, as well as the big farmers, were equally entitled to representation in this action. Each suffered the same danger of being put out of business by the *McBryde I* opinion.

The argument on the part of the State that the Small Owners' counsel contributed absolutely nothing to the litigation approaches the frivolous. Equally frivolous is the State's claim that it was unnecessary to have separate counsel looking out for the Small Owners' interests. Carried to its logical conclusion, it would have been equally unnecessary for either Robinson or Olokele to have had their own counsel and only one attorney would have been necessary to represent all parties.

To this court, this position on the part of the State fits squarely into the pattern heretofore referred to and noted by the court of appeals: "The State defendant apparently have endless time and energy." *See* note 1, *supra.*

That McBryde, knowing the cost of the anticipated litigation was far beyond the financial means of the Small Owners, yet recognizing the utmost importance that the true dimensions of the case be made manifest to everyone, decided that paying for all attorneys' fees and costs for the Small Owners was a sound business, as well as a legally sound tactical decision on its part.

One of the purposes of the Fees Award Act was to make it possible for those without funds to obtain representation in support of their rights. It is immaterial who pays for the litigation fees. There are a multitude of cases in the Federal Supplements and Reporters where civil rights organizations have funded the litigation from behind the scenes. *See Cole v. Tuttle,* 462 F.Supp. 1016, 1019 (N.D.Miss.1978), *Dennis v. Chang,* 611 F.2d 1302, 1306 (9th Cir. 1980) (".... [a]ppellants concede that attorney's fees may be awarded under the Fees Award Act even though plaintiffs have been represented without charge by a legal services organization.")

Here, McBryde paid for that representation and it is entitled to reimbursement. The records of Bunn's time are detailed, his fees were reasonable and necessary, and recovery of those fees must be awarded to McBryde.

■ The State argues that because attorney Shiraishi, a "country lawyer", kept no billing records, kept no time sheets, and billed his clients (the Small Owners) only nominal amounts, therefore, Shiraishi's bill should not be paid by the State. When Shiraishi, on September 26, 1973, charged $2,700 for his services and $162.81 for his expenses in traveling to Hanapepe to see the ditch and the lands of his clients, and traveled to Honolulu to appear before the Supreme Court after *McBryde I,* neither *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974) or *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67 (9th Cir.1975) had been written. This court could almost take judicial notice that solo "country" practitioners at that time kept no time records. Their charges were based upon what they thought their time and services were worth, considering the nature of the case and the financial standing of the client.[16] This court cannot fault Shiraishi for conducting his solo practice in the "good old way", nor can it deny repayment to McBryde for the bill he submitted. McBryde found it reasonable, and so does this court. As was shown by Shiraishi's

---

**16.** Robinson's attorneys apparently used the same method.

response to the Affidavit of Paul Alston of May 2, 1986, Exhibit 2, Shiraishi continued to be involved in the case as co-counsel with Bunn; that he did so act is shown by a subsequent billing to McBryde. The payment of Shiraishi's bill is approved.

## IV. PRE–ROBINSON I LITIGATION FEES AND COSTS

■ In its application, McBryde has asked for reimbursement of attorneys' fees for the work performed by its counsel after the initial decision in *McBryde I,* but before filing the instant complaint. As the record shows, since the Hawaii Supreme Court had blithely omitted any consideration of its unconstitutional taking of the property rights of McBryde, it was necessary for McBryde to attempt to raise that issue before the Hawaii Supreme Court. This was done.

The Hawaii Supreme Court, however, adamantly refused to consider the problem at all. It even refused to permit McBryde to argue the matter. In order to preserve the constitutional question, it was then necessary for McBryde to attempt to secure a review of the *McBryde I* and *McBryde II* 55 Haw. 260, 517 P.2d 26, decisions by a petition for certiorari to the United States Supreme Court. This failed because the constitutional question had been completely excised by the Hawaii court.

The State maintains that McBryde is not entitled to recover its fees and costs for work done in connection with those unsuccessful proceedings that preceded the filing of *Robinson I.* McBryde is seeking $150,-882.61 in attorneys' fees then paid. This amount includes $8,997.57 incurred by McBryde as its "share of [Hawaiian Sugar Planters' Association]" expenses in 1973 and 1974. Those expenses arose out of the filing of an amicus brief by the Hawaiian Sugar Planters' Association ("HSPA") in

the post-*McBryde I* proceedings.[17] The Hawaiian Sugar Planters' Association necessarily appeared as amicus in attempting, on behalf of all of the sugar plantations in Hawaii, to change the *McBryde I* decision.

As heretofore noted, almost every sugar plantation in Hawaii was, potentially, destructively injured by *McBryde I.* Almost all had acquired water rights; almost all diverted waters out of their watershed into the dry-land areas of their plantations. Not alone would Robinson, Olokele, McBryde, and the Small Owners be ruined, but, as indicated heretofore, the entire sugar industry of Hawaii would be practically destroyed if *McBryde I* were to remain unchallenged as the law of Hawaii.

The position of the State is that the Ninth Circuit held that McBryde's attempts to secure a rehearing before the Hawaii Supreme Court and review by The Court to correct the *McBryde* decisions were irrelevant to McBryde's efforts in the federal courts, and were not part of the prescribed procedural scheme for enforcement of rights under 42 U.S.C. § 1983. The State insists that "the law of the case, and the doctrine of judicial estoppel, bar [McBryde] from asserting now that § 1988 is applicable to those pre-filing proceedings." The State also argues that any work that McBryde did before filing this proceeding in the federal court is beyond the scope of § 1988. The State maintains that McBryde has not shown that any "discrete portions of the pre- and post-filing work done in the Hawaii Supreme Court and the United States Supreme Court were both (1) useful, and (2) necessary to the advancement" of McBryde's civil rights claim.

The State's argument that the pre-filing efforts of McBryde were neither useful nor necessary to advance the federal litigation is without merit. Persistently, in all the federal court proceedings, the State has

**17.** In April 1974, CSF & W billed Hawaiian Sugar Planters' Association ("HSPA") $57,200 for its work done for the HSPA in connection with the U.S. Supreme Court proceedings between January 1, 1974, and March 31, 1974. The law firm of Hoddick, Reinwald, O'Connor & Marrack also worked with the HSPA on the same problem and billed the HSPA $22,500 for

its work. Also, the firm of Kobayashi, Watanabe, Sugita & Kawashima assisted in HSPA's amicus, and that firm's bill was also included in HSPA's charges. As indicated, McBryde's claim of $8,997.57 is but a relatively small portion of the total attorneys' fees paid by HSPA in its efforts to secure review of *McBryde I* by The Court.

claimed that McBryde had had its "day" in the Hawaii Supreme Court on the constitutional question, and that the denial of certiorari by The Court precluded further federal review in this court.

That issue was disposed of by the Ninth Circuit in *Robinson III*.[18] The Ninth Circuit found "that Robinson's due process claims were not, and could not have been, litigated in the McBryde State proceedings because the Hawaii Supreme Court refused to consider Robinson's federal claims:"[19]

> Where a state court has refused to entertain federal constitutional claims, a federal court violates the precepts of neither subject matter jurisdiction nor res judicata hearing those claims.[20]

Nowhere does this court find that the Ninth Circuit held that the pre-filing proceedings were irrelevant to claimants' efforts in this, or any of the appeals courts. This matter is not res judicata.

As noted by McBryde in its Reply Memorandum of May 6, 1986, p. 16, it was not certain and clear until *Patsy v. Florida Bd. of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) that it was unnecessary to exhaust judicial and administrative remedies prior to filing a civil rights action. It was thus reasonable for McBryde to have assumed that its pre-filing motions were necessary groundwork for its subsequent civil rights action in this court.[21]

If further evidence of the importance of McBryde's pre-filing proceedings is necessary, one need but refer to this court's decision in *Robinson I*, wherein is found a multitude of references to facts and acts developed in and taken from the earlier proceedings.

Contrary to the State's position, in this case McBryde should be reimbursed for all of its attorneys' pre-filing time.[22] *Webb*

held, "There is certainly nothing in section 1988 that limits fee awards to work performed after the complaint is filed in [federal] court."[23]

As indicated above, it was reasonably felt by McBryde that it was necessary to exhaust all judicial remedies prior to filing its action in this court. As the record shows, certainly here, the McBryde's pre-filing actions served as a springboard for this federal proceeding.[24] As in *Bennett*, here, too, the pre-filing work was directly usable in this case. It appeared to this court that one of the basis for the relatively short trial in this court was the intense preparation that had been made by McBryde's attorneys in its pre-filing efforts.

This court concludes that all pre-filing attorneys' fees were reasonable and necessary, and McBryde should be reimbursed for not only its direct billings by Shiraishi and CSF & W, but also for its share of the Hawaiian Sugar Planters' Association's legal efforts on behalf of it as well as all other sugar plantations in Hawaii.

The State insists that

No Fees Should be Paid to any Claimant for Time Related to (1) Educational Activity; (2) Stifling Publication of Professor Chang's Writings; (3) Promoting Publicity; (4) Time Devoted to Obtaining an Unofficial Transcript of Proceedings Before in the Hawaii Supreme Court; (5) Time Devoted to Unsuccessful Efforts to Disqualify William Richardson from Participating in the Proceedings Relating to the Certified Questions and the Unsuccessful Claim that his Participation Denied the Claimants Due Process of Law; or (6) Unsuccessful Legislative Reform Efforts.

---

**18.** 753 F.2d 1468, 1471–2 (1985).

**19.** Id., p. 1472.

**20.** Id., p. 1473.

**21.** *Bartholomew v. Watson*, 665 F.2d 910 (9th Cir.1982), a pre-*Webb* case.

**22.** *Webb v. Dyer County Bd. of Ed.*, 471 U.S. 234, 105 S.Ct. 1923, 85 L.Ed.2d 233 (1985).

**23.** Id., p. 250, 105 S.Ct. p. 1932.

**24.** *Bennett v. Central Telephone Co. of Illinois*, 619 F.Supp. 640, 646 (N.D.Ill.1985); *see also New York Gaslight Club, Inc., v. Carey*, 447 U.S. 54, 71, 100 S.Ct. 2024, 2034, 64 L.Ed.2d 723 (1980).

1. *Educational Activity:*

 This objection relates to the time spent by attorneys Cades, Bunn, and Leas of the CSF & W firm in assisting in preparation of and attending forums and conferences on water rights. This court has checked the list of time so spent, set forth on pages 1 and 2 of Exhibit C of State's Memorandum in Opposition of May 2, 1986. From this court's review of the Exhibit, it appears that the State's estimated and allocated time spent by those attorneys is correct, except for the entry of 10/25/77 of Cades—2.50 hours. The billing records show that this entry was for "revised proposed findings" and therefore was not properly allocated by the State into the "Educational" category. In its Exhibit, the State left the subject blank as to Bunn's billing for 11/10/77. This billing was for "Conf call w/JRC [J. Russell Cades] & Cox re Water Forum, Corelated Problems re Possible Appeal of Decision". McBryde was billed $127.50 for this conference call. This court, following the State's example, will estimate that half of that time was spent on "possible appeal of decision".

This court has calculated the time so allocated to the forum at the billing rates of Cades, Bunn, and Leas during 1973–76 and finds a total of $2,760.75 was paid by McBryde for such activity.

CSF & W argues that since those forums occurred during the litigation and "could possibly have given insight into the State Officials' position concerning the water law and the litigation, the time is compensable".

Undoubtedly, McBryde felt the same. Nevertheless, this court does not see that the time so spent should be properly charged as necessary to, a part of, or flowing from the litigation. The $2,760.75 must be, and is, deducted from McBryde's claim.

2. *Stifling Publication of Professor Chang's Writings:*

 The court is well aware of the fact that in this case, Professor Chang was more than an erudite professor of law at the University of Hawaii's School of Law. Chang was selected by and purportedly represented Chief Justice Richardson, and paid by the State in order to assist the State's Attorney General in the State's defense. This court can take judicial notice that some of the circuit judges of the Ninth Circuit on the bench during the pertinent years appeared to hold law review articles and conclusions therein in high esteem, since law review articles are normally written from an impartial scholar's standpoint. Anything written by Professor Chang during the time relevant here, however, could and would be only construed as written on a solidly partisan basis from the standpoint of an advocate representing his client. This court agrees with McBryde that the publication was intended to be, and was in effect, an additional brief for the State, after oral argument. The court of appeals even allowed McBryde to reply after the publication.[25]

From what actually occurred after its publication, it appears that CSF & W soundly devoted a considerable amount of time in making every effort available at that time to stop the publication of Chang's article, and McBryde is entitled to be reimbursed for the charges.

3. *Promoting Publicity:*

 On page 42 of the State's Memorandum in Opposition is set forth a list of 13 occasions in which CSF & W contacted newspapers, TV stations, and press conferences. The court agrees with the State that these could not be classified as hours expended on the litigation or in any way assisting the litigation process itself. We do not here have a class action in which publicity might aid in informing members and possible members of the class of the litigation.

This court recognizes that the injurious impact of *McBryde I* on all public and private owners and users of water in Hawaii would ultimately have to be rectified— either by litigation or by legislation. Any publicity favoring the State's position would have an effect, adverse to water

---

**25.** This does but substantiate this court's "judicial notice", *supra.*

users, upon the public and its elected legislators. It was to the best interest not only of McBryde, but all injured parties to get the most favorable publicity possible. The State, however, cannot properly be charged in this litigation for such action, even though clearly felt necessitated on the part of McBryde. This court has calculated the time spent on publicity, as reflected on page 1, item 1, and pages 3 and 4 and item 3 on page 5 on Exhibit C of the State's Memorandum in Opposition, at the rates then charged by CSF & W, using the State's own estimated time, and finds that the amount charged for that time totals $665.60. McBryde's application for that sum is denied.[26]

### 4. Time Devoted to Obtaining an Unofficial Transcript of the Proceedings Before in the Hawaii Supreme Court:

■ As noted in McBryde's Reply Memorandum of May 6, 1986, p. 18, in 1973 the Richardson Court had denied plaintiffs' request for a transcript of their hearings on their several post-McBryde I motions. As the record clearly shows, the absence of a transcript of these hearings showing the absolute refusal of the Richardson Court to listen to any argument on the question of the constitutionality of the Court's taking, was highly detrimental to McBryde. The basic issue which brought McBryde's case into this court was whether or not the Hawaii Supreme Court had afforded the plaintiffs due process. As indicated in # 5 hereunder, the conduct of Chief Justice Richardson was highly relevant. The cavalier treatment awarded the plaintiffs in the Hawaii Supreme Court immediately post McBryde I manifested the importance of a complete record of the proceedings in the Hawaii Supreme Court on the certified questions. Rejection of the request of the plaintiffs that there be an official reporter and transcript of these proceedings was further evidence of the Richardson Court's unreasonableness with respect to McBryde's claims. The time spent by McBryde's counsel in an attempt to secure both an official and an unofficial transcript

of these proceedings definitely became a part of and a necessary process of the litigation.

All of CSF & W's time spent on this matter is compensable.

### 5. Time Devoted to Unsuccessful Efforts to Disqualify William Richardson from Participating in the Proceedings Relating to the Certified Questions and the Unsuccessful Claim that his Participation Denied the Claimants Due Process of Law:

■ As reflected in # 4, supra, the State has urged that all time spent by CSF & W in attempting to get an unofficial transcript out of the Richardson Court should be disregarded. Although Justice Abe wrote the opinion in McBryde I, this court could almost take judicial notice that the opinion was in line with the philosophy of Chief Justice Richardson, and could just as well have been his opinion. From the record, it is patently obvious that it was Chief Justice Richardson who, from the moment McBryde I was filed on January 10, 1973, persistently and insistently used every means available to him to preserve his court's expropriation ukase. CSF & W would have been derelict in their duty to McBryde if they had not attempted to disqualify Chief Justice Richardson from participating in the Hawaii Supreme Court proceedings relating to the certified questions.

There is no merit to the position taken by the State's maintaining that Hensley v. Eckerhart, 461 U.S. 424, 435–36, 103 S.Ct. 1933, 1940–41, 76 L.Ed.2d 40 (1983) demands that the work of CSF & W on Chief Justice Richardson's disqualification be deleted from the fee applications. Hensley v. Eckerhart concerned itself with a case where different claims for relief were based on different facts and legal theories, and where counsel's work on one claim was unrelated to his work on another claim. It was in that context that The Court said, "[W]ork on an unsuccessful claim cannot

---

**26.** The State, on page 43 of its Memorandum in Opposition, charged that McBryde's overall claim should be reduced by 2%—i.e., $30,000 for CSF & W's effort in promoting publicity.

be deemed to have been 'expended in pursuit of the ultimate result achieved.' "[27] The State omitted to note that The Court continued,

"Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee ... In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit ... Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters."

McBryde won. It is entitled to recover these fees.

6. *Unsuccessful Legislative Reform Efforts:*

■ The State maintains that any time spent by CSF & W in connection with possible legislative action to nullify the destructive impact of *McBryde I* upon the plaintiffs is not compensable. McBryde correctly points out that fundamentally *McBryde I* was a politically motivated opinion. This court could take judicial notice of the close personal relationship of Chief Justice Richardson with Governor Burns, and the political basis for the appointment of both Richardson and Abe to the Hawaii Supreme Court, as well as the fundamental political philosophy of the Burns administration and the Hawaii Supreme Court, as evidenced by a plethora of its decisions. It was obvious to the plaintiffs that if they did not win the federal action, then they, perforce, would be compelled to turn to the legislature for salvation. There was, therefore, a sound economic basis for McBryde's counsel to explore the legislative approach for their clients.

Nevertheless, the time spent by McBryde's counsel in the legislative activities set forth in detail on page 48 of Hawaii's Memorandum of May 2, 1986, was not necessitated by nor a part of this federal action. This court has calculated the time spent on such legislative efforts, as reflected on page 48, supra, at the rates then charged by CSF & W using the State's own estimated time,[28] and finds that the amount charged for that time totals $1,186.50. McBryde's application for that sum is denied.[29]

## V. FEES FOR PRESCRIPTIVE RIGHTS AND STORM AND FRESHET WATER CLAIMS

■ The State maintains that McBryde is not entitled to recover any fees and costs during 1974–78 for work done in connection with the counterclaim filed by McBryde relating to prescriptive rights and storm and freshet water. Upon filing their suit in the federal court, all of the parties, perforce, had to bring before this court all of the issues that arose out of the Hawaii Supreme Court decision in *McBryde I.* As the State itself points out, on page 51 of its May 2, 1986 Memorandum, McBryde sought to have this court decide the proper allocation of prescriptive rights and the allocation of so-called storm and freshet water. A non-adversarial review of this court's analysis in *Robinson v. Ariyoshi,* 441 F.Supp. 559, 586–87 (D.Haw.1977) of McBryde's crossclaim for prescriptive rights to 2,084,600 gallons per day of normal surplus water against G & R, as well as the problem of the Water Commissioner's award of all storm and freshet surplus waters, will reveal the true basis of this court's leaving the issue of prescriptive rights and storm and freshet waters to the Water Commissioner. The underlying basis of that conclusion was both the ambiguity of the *McBryde I* and *II* opinions on this subject, as well as, and more impor-

**27.** *Hensley v. Eckerhart,* 461 U.S. at p. 435, 103 S.Ct. at p. 1940.

**28.** Items 4 and 5 on page 48 do not reflect the time spent. This court has reviewed the McBryde print-outs and finds that the two discussions listed were, in fact, telephone calls.

The court has therefore allowed .25 hours to each call, as heretofore been done by the State.

**29.** Because McBryde's legislative time should not be held compensable, the State, on page 49, has asked that McBryde's lodestar should be reduced by 1%—i.e., approximately $15,000.00.

tantly, the fact that this court was overturning the premise of *McBryde I* that the State owned all the water, whether claimed by prescriptive right or as storm and freshet.[30]

If McBryde had not been successful in overturning *McBryde I,* then this court would have had nothing to refer back to the Water Commissioner. While McBryde did not get what it sought out of this court, it was successful in getting an opportunity for a review of its claims, albeit subsequently.

Those problems were definitely a part and parcel of this federal action, and *Hensley v. Eckerhart, supra,* supports this court in denying the State's objection.

## VI. STATE'S OBJECTION FOR DUPLICATIVE OR EXCESSIVE WORK

The State objects that because some 19 different attorneys of the CSF & W firm worked on McBryde's problems, 9 attorneys worked for Olokele, and 4 or more represented Robinson, that, perforce, there was overstaffing and over-duplication of work. The State deliberately bypasses the fact that CSF & W and its attorneys represented not only McBryde but also the Small Owners. It also bypasses the fact that Olokele and Robinson are separate and distinct corporate entities from McBryde. Each of the plantations were entitled to have their lawyers. Inasmuch as this case has occupied the attention of all parties (including this court) since 1973—now over 15 years—it is to be expected that a considerable number of attorneys would appear to have worked from time to time on varying aspects of the case.

The record is clear, and the State must admit, that CSF & W, throughout the case, was lead counsel and McBryde bore the greatest financial burden of any of the plaintiffs.

In a case of this magnitude, it was necessary that the most experienced attorneys in CSF & W should devote the most attention to McBryde's problems. A review of the attorneys and their fees shows that there

were many matters which were referred to attorneys on a lower pay scale than the three lead counsel for McBryde—Cades, Bunn, and Leas.

In a case of this importance, much cross consultation was demanded of all of the attorneys—McBryde's attorneys with those of Olokele and Robinson, and McBryde's attorneys with mainland counsel and both water and Constitutional law experts who were acknowledged as outstanding in the particular legal fields involved in this case.

The plaintiff McBryde itself would have been the first to complain if it felt that its attorneys were "churning" with each other in order to create more chargeable time. As shown by the affidavit of Michael Marks, attached to McBryde's Memorandum in Support, of May 6, 1986, McBryde carefully scrutinized the bills of CSF & W.

This court finds absolutely no merit in this objection of the State. This court could discern no "overstaffing" or "over-duplication" of any services, or that multiplicity of counsel gave rise to an inefficient use of any attorney's time.

This court has reviewed the billing records outlined by the State on the subject of inter-firm conferences, telephone calls, and duplicative work and, contrary to the State's conclusion, finds that all of the work engaged in by McBryde's counsel, as well as that of Olokele, Robinson, and the Small Owners, was reasonably necessary in order to make sure that all of the plaintiffs' several interests were properly and, where at all possible, jointly presented. A case of such vital importance to McBryde demanded that counsel call in outside consultants, professors, and attorneys in order that every possible area of attack should be fully explored and checked and rechecked in the preparation and presentation of briefs on appeal. To repeat: this court could find no unreasonable duplication of effort and excessive time spent in conferences, as charged by the State.

---

**30.** This court notes that the State's quotations from this court's decision in *Robinson 1,* as set out on pages 50 and 51, were taken out of context.

The State itself appears to have spent outlandish and excessive time in giving almost microscopic examination to CSF & W's billing. It complains that although CSF & W "charged more than 7,000 lawyers hours to this case" through June 1985, it filed less than 900 pages of briefs, memoranda, and pleadings. (This excludes exhibits.) The State cries out that this works out to an average of more than 7 hours per page. Then the State compares this to "the effort of the lone State Deputy Attorney General, Andrew Lee, who virtually single-handedly did all of the briefing and argument from 1974 through part of 1985." This court totally rejects such preposterous comparison. The State had nothing to lose except its expropriated water. McBryde's very existence was at stake. McBryde was compelled to review in depth every possible avenue of law and fact which could aid in bringing about the ultimate salvation.[31]

The court finds McBryde's claim to be substantially and reasonably correct.[32]

## VII. FEES FOR EX PARTE CONFERENCES WITH THE COURT

■ The State has pointed out that Cades had some 5 ex parte meetings and telephone conferences with this judge in 1976, 1979, 1981, and 1983. On three of those conferences, Cades indicated in his billing that the meeting with this judge was "re status" or "discussing hearing on memorandum with the court" or "discussing supplemental filings". On two occasions, the billing was for telephone conferences with this judge. This judge stated in open court when the matter was being argued in 1986 and 1987 that it had no independent memory at that time of what was discussed with Mr. Cades. It is not unusual for this judge to discuss matters of the nature referred to above with counsel—ex parte—if the court feels that such discussions shorten the time and efforts of everyone involved in the case. This court finds it both acceptable and reasonable, and approves McBryde's claim for these charges.

## VIII. TAX ADVICE

■ The State objects to McBryde's request for approximately $5,000 billed in the late 1984 for advice to McBryde as to whether its attorneys' fees should be amortized or capitalized for tax purposes. This court agrees with the State that such advice was not related to the substantive or procedural aspects of the case, and McBryde's claim for this $5,000 must be denied.

## IX. COMPENSATION FOR CONSULTANTS

■ The State maintains that all the consultant fees must be disallowed, basically arguing that CSF & W is such a prestigious firm that it should never need to consult with anyone else on matters of law and procedure. The State cites *Ramos v. Lamm,* 713 F.2d 546, 555, 559 (10th Cir. 1983), which held that "[A]ttorneys in most metropolitan areas are able to handle Civil Rights litigation without outside counsel." This case, however, is not a run-of-the-mill Civil Rights case, such as *Ramos v. Lamm.*

The State objects to the payment of $1,000 to a consultant, Les Watson, on May 16, 1973, and payment of $625 to Sho Sato on June 9, 1973. The record shows that Les Watson is a consulting engineer and an appraiser, and an expert in the field of water rights and had acted as a Master in the Kauai litigation. Sato was a professor on water rights at Boalt Hall, and he was being consulted as a possible use as an

---

**31.** It is obvious to this court that in 1986, 1987, and 1988 the State has hired outside counsel and many more state employees other than Andrew Lee have been engaged in reviewing the matter of fees. "The shoe is now on the other foot": the State is *now* worried about being forced to pay a large amount of money to the successful plaintiff, McBryde.

**32.** In its 1985 Motion for Fees, McBryde included certain payments:

| | |
|---|---|
| Case, Kay & Lynch | $8,751.32 |
| Preparation for meeting with A & B re strategy of Maui Hanani case (May 11, 1976; 1.5 hours) | 150.00 |
| Conference re Hanani Stream (May 17, 1976; 1 hour) | 100.00 |

In its 1988 Motion, these payments were omitted.

expert in the case. In 1973, McBryde most certainly and most reasonably needed all the help it could get in this case. The court finds that McBryde's counsel properly was entitled to consult with experts in the field of water litigation. The court approves McBryde's claim for these two charges.[33]

Between January and August 1974, CSF & W, for McBryde, hired Erwin Griswold of the Washington, D.C. firm of Jones, Day, Reavis and Pogue, who personally spent 162.75 hours and, with an associate, Friedman, an additional 288.50 hours on behalf of McBryde's case, and charged $33,819. Griswold's work took place in 1974, during the time that McBryde was carrying on its appeal from *McBryde I* and *II*. As part of his work, Griswold and his assistant came to Hawaii and inspected the Hanapepe area on Kauai. The State maintains that the research done by Griswold and Friedman centered on federal jurisdiction issues, and that all of the cost, therefore, of their time and efforts cannot be claimed by McBryde.

This court is aware that CSF & W has represented clients before the Supreme Court of the United States. No one in the firm, however, has had any but sporadic appearances before The Court. The firm itself admits that Griswold's firm filled the gaps of CSF & W's knowledge of and experience before The Court. This court finds Griswold and Friedman's work and charges necessary and reasonable. McBryde's claims for them is approved.

Between September and November 1978, Herbert Wechsler, Professor of Law at Columbia University, spent 145 hours and charged $16,000. Telford Taylor, Professor at Law at Columbia University, between September–November 1978, spent 109 hours and charged $18,300. In 1978, both Doctors Wechsler and Taylor were recognized as among the most eminent constitutional scholars in the United States. This court's decision in *McBryde 1* was, at that time, on appeal to the Ninth Circuit. The State had Professor Chang of the University of Hawaii School of Law actively assisting it (and Chief Justice Richardson) in resisting every constitutional aspect of McBryde's case. With the resolution of the constitutional question by the court of appeals so imminent, it was reasonable for CSF & W to secure the assistance of these experts in the field to develop every aspect of McBryde's constitutional claim. The importance of the case demanded that CSF & W and McBryde avail themselves of such experts in the preparation of their briefs to the court of appeals. It was more than reasonable for CSF & W to augment their own legal "muscle" with additional "muscle", such as that possessed by the two professors. This court finds the hours and work of Wechsler and Taylor to be sufficiently identified, as well as reasonable, and approves McBryde's claim for payment for their services.

In March 1986, the Washington, D.C. law firm of Sidley and Austin billed McBryde $3,000 for the services of one of its partners, former Solicitor General Rex Lee, for work he performed in connection with the State's 1985 Petition for Certiorari from the Ninth Circuit's opinion in favor of McBryde. The State called Attorney Lee's work "plainly duplicative" because Lee completely reviewed the State's Petition for Certiorari and other briefs, analyzed the Ninth Circuit's opinion, consulted with the Justice Department officials, researched relevant cases, met to plan strategy, etc. The State maintains that "McBryde needed no help in reading the Petition for Certiorari and the Ninth Circuit's opinion, and in determining strategy."

Not only McBryde, but this court, too, was surprised that The Supreme Court should request the Solicitor General to brief this case, after the State filed its Petition for Certiorari. This court is only too well aware of the effect that the Solicitor General's brief had on the case.[34] There is no question but that the hiring of Attorney Lee was a most reasonable act on the part of CSF & W and McBryde—even though his efforts did not deter The Su-

---

**33.** Cf. *Feher v. Dep't. of Labor and Industrial Relations,* 561 F.Supp. 757 (D.Haw.1983).

**34.** *Robinson v. Ariyoshi,* 676 F.Supp. 1002, 1004 (D.Haw.1987) [*Robinson IV*].

preme Court from granting certiorari. McBryde is entitled to be reimbursed for Lee's services.

## X. McBRYDE'S COSTS

The State itself says:[35] "While acknowledging the Ninth Circuit's position[36] that certain reasonable out-of-pocket expenses are recoverable, the State has disputed many items that McBryde seeks to recover as (1) unreasonable, or (2) overhead, which is not properly taxable as costs."

This problem was fully analyzed by the *Thornberry* panel (676 F.2d at 1244) and, citing *Northcross v. Board of Education*, 611 F.2d 624 (6th Cir.1979), said:

> Some expenses are included in the concept of attorney's fees, as "incidental and necessary expenses incurred in furnishing effective and competent representation," and thus are authorized by § 1988 [Attorney's Fees Act]. *See* remarks of Congressman Drinan, 122 Cong.Rec. H12160 (Daily ed. 1 Oct. 1976), *Beazer v. New York City Transit Authority*, 558 F.2d 97 (2d Cir.1977), *rev'd on other grounds*, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979). The authority granted in section 1988 to award a "reasonable attorney's fee" included the authority to award those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services. Reasonable photocopying, paralegal expenses, and travel and telephone costs are thus recoverable pursuant to the statutory authority of § 1988.

611 F.2d at 639.

McBryde's claim is allowed.

### A. *Secretarial Expenses:*

On page 91 of the State's Memorandum in Opposition of May 2, 1986, the State listed nine different billings between 1973 and 1985 as encompassing secretarial work. McBryde's response is that all of the identified billings to McBryde for such secretarial services were "the de minimus charges for secretarial overtime and services". CSF & W insists that these charges were for extraordinary services, not overhead, forced to be incurred as a direct result of the particularized demands made upon the firm at the specific times identified because of the state of the litigation on those occasions, and its time restraints.

The general rule is that a prevailing party is entitled to all costs which are not routine office overhead, and expenses normally billed to fee-paying clients are allowable as taxable costs. *See Dowdell v. City of Apopka*, 698 F.2d 1181, 1192 (11th Cir. 1983), and *Gorelangton v. City of Reno*, 638 F.Supp. 1426, 1433 (D.Nev.1986). The court finds that the secretarial costs were not routine office overhead, and they were specially billed to McBryde. McBryde's claim for reimbursement is allowed.

### B. *Computer–Related Research Costs:*

This court recognizes that various courts in various cases involving various facts[37] have not agreed on the issue of whether computer-aided research can be recovered as "costs" by the prevailing party.

This court agrees with the analysis set forth in *United Nuclear Corp. v. Cannon*, 564 F.Supp. 581 (D.R.I.1983):

> Lexis is an essential tool of a modern efficient law office. As such, it saves lawyers' time by increasing the efficacy

---

**35.** State's Memorandum in Opposition of May 9, 1988, p. 46.

**36.** *Thornberry v. Delta Air Lines, Inc.*, 676 F.2d 1240 (9th Cir.1982), *vacated on other grounds*, 461 U.S. 952, 103 S.Ct. 2421, 77 L.Ed.2d 1311 (1983).

**37.** *See Leftwich v. Harris–Stowe State College*, 702 F.2d 686 (8th Cir.1983); *Freidlander v. Nims*, 583 F.Supp. 1087, 1089 (N.D.Ga.1984); *Babb v. Sun Co., Inc.*, 562 F.Supp. 491, 495 (D.Minn.1983); *Levka v. City of Chicago*, 107 F.R.D. 230 (N.D.Ill.1985); *United Nuclear Corp. v. Cannon*, 564 F.Supp. 581 (D.R.I.1983); *Ortega v. City of Kansas City, Kansas*, 659 F.Supp. 1201, 1219 (D.Kan.1987); *E.E.O.C. v. Sears, Roebuck and Co.*, 111 F.R.D. 385, 394 (N.D.Ill.1986), *aff'd*, 839 F.2d 302 (7th Cir.1988); *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 663 F.Supp. 1360, 1457 (D.Kan.1987); *Dowdell v. City of Apopka*, 698 F.2d 1181, 1192 (11th Cir.1983); and *Gorelangton v. City of Reno*, 638 F.Supp. 1426, 1432 (D.Nev.1986).

of legal research. Denial of reimbursement for Lexis charges in a proper case would be an open invitation to law firms to use high-priced attorney time to perform routine research tasks that can be accomplished quicker and more economically with Lexis. This, in turn, would lead inevitably to increased staffing of civil right cases, and thus to larger fee awards. The Court will, therefore, treat Lexis charges as other cost items in the case.

and, with *Gorelangton v. City of Reno*, 638 F.Supp. 1426, 1432 (D.Nev.1986) that expenses normally billed to fee-paying clients should be allowable as taxable costs. McBryde is entitled to be reimbursed for CSF & W's computer-aided research costs.

### C. *Compensation for Travel Time:*

The State maintains that since the travel time spent by McBryde's attorneys show little or no work done on the litigation, McBryde cannot recover the same, "or at the very least, the hourly-rate should be reduced to reflect the lesser efficiency that necessarily accompany such efforts." [38]

As the cases cited by the State [39] reflect, there is no uniformity among the courts "in the first 48" states as to what, if any, should be allowed for travel time and traveling costs. Some have denied it completely, others have allowed some, if not all. Travel time in Hawaii presents an entirely different problem from that in the "48". This court takes judicial notice that Hawaii normally is two hours later, and under daylight savings time three hours later than mainland time. Although it takes but between $4\frac{1}{2}$ to 6 hours (depending on upper-air winds) to fly to the west coast, to this must be added waiting time at airports. If travel is beyond the west coast, there is an additional 3 hours time differential.

It is thus practically impossible for any attorney to do any business on the west cost on the same day that he flies. If the flight is to Washington, D.C., any same-day work is impossible. Moreover, the normal scheduled flying hours mandate an overnight stay in the destination city anywhere on the mainland. Added thereto is the matter of jet lag and the necessary curtailment of work after arrival, because of that factor. Unless an attorney is willing to take a "red-eye special" leaving 10—12 p.m., Hawaii time, it is normally impossible to conduct any work anywhere on the mainland on the same day the flight occurs.

In any event, the traveling attorney will normally lose at least two working days each time he takes a mainland trip. For these reasons, this court has normally allowed all reasonably necessary travel time to be charged as costs in fee applications in bankruptcy, as well as civil actions for both local attorneys going to the mainland, and mainland attorneys coming to Hawaii. This case presents to this court no different problem. This court will allow as reasonable and necessary costs the travel time charges and concurrent expenses billed by CSF & W to McBryde and paid, as proper billing, by McBryde.

### D. *Telephone Charges:*

The State has objected to certain long distance calls to Oregon, San Diego, Arizona, and Los Angeles on July 9 and 10, 1986, and a telephone call by Cades on July 9, 1986, "TC Al Capeda in Ed Ing's Absence". McBryde has not responded to this objection. This court notes, however, that on 3/27/86 Cades telephoned to "Ed Ing of DC office", and in another entry on 6/10/86 Leas telephoned to "A. Capeda re finalizing briefs".

From the above, it appears to this court that both Ing and Capeda were attorneys associated with former Solicitor General Rex Lee. McBryde's claim for reimbursement is proper.

Although the calls to Oregon, San Diego, Arizona and Los Angeles are not specifically identified, the timing thereof, however, coincides with the intense activity of CSF & W in connection with the State's Petition for Certiorari, and this court will approve the same.

---

**38.** State's Memorandum, p. 49.

**39.** Id.

## E. Fees for Printing and Photocopying:

█ The State objects to McBryde's charges for the cost of printing materials filed with the United States Supreme Court in connection with McBryde's unsuccessful efforts to obtain a review of *McBryde I,* as well as the cost of photocopying documents in connection with McBryde's proceedings in this case. The State also objects to the charges made by CSF & W for photocopying.

As instructed by the Ninth Circuit in *Thornberry v. Delta Air Lines, Inc., supra,* at page 1244–5, "incidental and necessary expenses incurred in furnishing effective and competent representation" are authorized by § 1988 and should be awarded if the expenses are those reasonable out-of-pocket expenses which are normally charged to a fee-paying client[40] in the course of providing legal services. All of the printing and photocopying objected to by the State was, in this case, certainly reasonably incurred expenses and charged to its fee-paying client by CSF & W. This court notes that even as late as 1984, CSF & W was charging but 10¢ a page for photocopying. It was not until 1985 that it raised those costs to 15¢ a page. This court has had the problem of charges for photocopying before it many times, and in those cases in which this court felt that the charges had been deliberately enhanced by the applicants, they were cut by this court to as low as 8¢ a copy. In other cases, due to factual differences, this court has allowed as much as 20¢ a page. In this case, the court finds that the charges made by CSF & W were reasonably billed to McBryde, and, as the record shows, were found by McBryde to be reasonable under the circumstances. This court approves all of the printing and photocopying charges made by CSF & W, paid by McBryde and were made a part of McBryde's claim against the State.

## F. Miscellaneous Costs:

█ In its Memorandum in OPposition of May 2, 1986, on page 95, the State has objected to certain miscellaneous costs, viz:

| YEAR | EXPENSE | AMOUNT |
|---|---|---|
| 1974 | "Business Entertainment" | $156.96 |
| 3/11/74 | Long Distance Telephone Call to South Africa | 25.92 |
| 04/26/76 | Lunch for Mr. Bunn (and guest?) | 13.00 |
| 04/27/76 | Lunch for Mr. Bunn (and guest?) | 14.20 |
| 10/30/81 | Lunch for Mr. Leas (and guest?) | 9.24 |
| 06/12/85 | Courier to deliver memorandum re attorneys' fees to the Ninth Circuit [necessitated only by tardy preparation of memorandum] | 119.50 |

McBryde could well understand why certain business entertainment lunches, etc., would be properly charged to it in connection with the use of other attorneys and experts that were working with CSF & W on the case. Nevertheless, the State's objections to such charges are basically correct, and those entertainment and luncheon charges are not approved by this court.

█ The State's objection to the telephone call to South Africa in 1974, like a multitude of other objections of the State, are basically "de minimus", but the State, having sifted this call out, and McBryde, not having explained the same, this court will deny McBryde's claim for that call.

The State's objection to courier delivery of documents to the Ninth Circuit on June 12, 1985 must be denied. This court takes judicial notice that there is a regular commercial service for personal delivery of important documents to the mainland. This courier service is necessitated by the time differential, above referred to, between Hawaii and the mainland United States. The business day starts in New York while Hawaii is soundly sleeping, and the daylight savings time which makes the differential 3 hours between Hawaii and the west coast is in full effect from April through October. This court allows McBryde's claim for courier service.

## G. Time Spent on Preparation of Fee Application:

█ The State maintains that the more than 600 hours spent by CSF & W in the preparation of its application for fees and costs should be substantially reduced. The

**40.** McBryde certainly was a fee-paying client.

State maintains that because McBryde delayed so long in filing for its fees, its attorneys and paralegalists necessarily had to spend "an inordinate amount of time re-collecting and re-sorting records from storage", and in poring over the records of more than a decade ago. The State maintains that there was duplication of effort, and fee counsel spent an inordinate amount of time in familiarizing himself with the case.

When this court notes the microscopic scrutinization of apparently each and every item of McBryde's fee application indulged in by the State, it appears to this court that McBryde's approximately 600 hours must have been surpassed by the State's attorneys and staff in preparing its objections and opposition. Apart from that non-critical inference on the part of this court, from the intense litigious attack adopted by the State from the moment that *McBryde I* gave the expropriated (stolen) water to the State, McBryde's attorneys could but expect continued intense litigious opposition to McBryde's claim for fees.

Upon reviewing the 15–year–history of this case with its multitude of hearings before the several courts, it appears to this court that the time spent by McBryde's attorneys in preparation of the fee claim was clearly reasonable, and McBryde should be compensated for it.[41]

■ As another example of the microscoptically detailed analysis and criticism of CSF & W's billing, the State criticizes an associate, Donna Leong, in CSF & W for spending 30.5 hours shepardizing, reviewing, and analyzing cases citing *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985).[42] The State also objects to the fact that more time was spent in a like manner by attorneys more senior to Ms. Leong.

The State's position borders on the frivolous. As this court's decision of November 25, 1987, indicates, *Williamson County*, together with several successor cases thereto[43] coming out of The Court, demanded the most intensive review and analysis possible. This court and its staff spent far more than 30 hours in attempting to find any possible application of *Williamson County* to the plaintiffs' water rights litigation. The time spent by McBryde's counsel in their painstaking research and analysis of *Williamson County*, etc., was necessary, and McBryde should be reimbursed for it.

## XI. THE ATTORNEYS' FEE LODESTAR

■ The State maintains that the fees charged by CSF & W are excessive and should be reduced.

This is not the ordinary section 1988 case. This is no general public interest suit. This is no class action. McBryde's attorneys did not assume any risk of winning or losing, but McBryde's and the Small Owners' very life and livelihood were at risk. If, at any time prior to May 29, 1987, when the State's Water Code became effective, the plaintiffs had lost, their industrial and corporate life would have ended, and the Small Owners would have been in dire straits. McBryde was forced to get lawyers of the highest quality in the community, lawyers in whom they had full confidence as to their ability and integrity, lawyers whom they believed would do everything within their legal power to save the plaintiffs from absolute ruin. The risk was entirely McBryde's. Their lawyers were regularly paid.

The State attacks the hourly rates charged by the members of the CSF & W firm, and because the rates have steadily gone higher over the years, the inference the State would have this court draw is

---

**41.** *Cf. Thornberry v. Delta Air Lines, Inc.,* 676 F.2d 1240 (9th Cir.1982).

**42.** *See* State's Memorandum in Opposition of May 9, 1988, p. 13.

**43.** *Macdonald Sommer & Frates v. Yolo County,* 477 U.S. 340, 106 S.Ct. 2561, 91 L.Ed.2d 285

(1986), *Nollan v. California Coastal Com'n,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), and *First Evangelical Lutheran Church of Glendale v. Los Angeles County, Cal.,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987).

that the fees were deliberately inflated with the belief that eventually the State would have to pay for them.

Any such inference is entirely without merit. Though, as reflected in this court's decision in *Robinson I* this court then felt (and still feels) that the State's position was factually, equitably, and legally unsupportable, nevertheless, as the remand of the Supreme Court illustrates, any such belief or prognostication of success is not infallible. No attorney of the experience and reputation of Cades or his associates would ever continue to "over-bill" a regular fee-paying client on the basis that the opposing party would ultimately have to repay the client.

As the preceding analysis in the case, except as specifically found to the contrary by this court, the attorneys' fees and costs and expenses billed through December 31, 1987, and paid by McBryde are reasonable, and McBryde is entitled to be reimbursed in the amount of $1,198,301.29 [44] & [45] less $18,833.49, viz., the sum of $1,179,467.80, and the State is ordered to pay the same to McBryde.

## XII. COMPENSATION FOR DELAY IN PAYMENT OF FEES, COSTS, AND EXPENSES

 McBryde maintains that it is entitled to compensation for delay in payment of the attorneys' fees, costs, and expenses that it has incurred from 1973 through December 31, 1987. McBryde made a similar request in its 1986 application. In 1986, in its Memorandum in Opposition, filed May 2, 1986, the State stated, "[A]ll of the claimants seek an upward adjustment to compensate for delay. The State acknowledges that some inflationary adjustment is within the court's discretion; however, it disagrees with the formulae offered by the claimants." [46] Since then, the State

has settled out with Robinson and Olokele. Only McBryde's claim remains.

In the State's Memorandum in Opposition, filed May 9, 1988, the State takes a 180 degree turn from its 1986 position:

> The State originally argued that an inflationary adjustment should be used to compensate *McBryde's counsel* for any delay *it* may have experienced. In light of *McBryde's counsel's* failure to demonstrate any such delay in payment (*as opposed to delay in reimbursing McBryde*), and intervening Supreme Court precedent, the State now maintains that no such adjustment is recoverable. (Emphasis added.)

State's Memorandum in Opposition filed May 9, 1988, at p. 24–25.

This new position on the part of the State, with its accompanying reasons for change, can only be condemned as a deliberate obfuscation. One is led to infer therefrom that the State did not discover that CSF & W were regularly paid by McBryde during all the years of the litigation until 1988. With certainty, the State knew from McBryde's October 29, 1985 Memorandum for Award of Attorneys' Fees that McBryde was asking for repayment to it, McBryde, of the attorneys' fees, costs, and expenses it had incurred over the (then) preceding 12 years of litigation. In their 1986 response to McBryde's Motion, the State prepared an extensive table [47] in which the State calculated the inflation adjustment from the date *McBryde paid* the fees!

This court has been unable to find any case which says that plaintiffs who pay for their attorneys get lesser protection under 42 U.S.C. § 1988 than indigent or pro se plaintiffs. If the State's argument were taken to its logical conclusion, then plaintiffs who, like McBryde, paid their attor-

---

**44.** *See* McBryde's Supplemental Exhibit B Regarding Compensation of June 3, 1988.

**45.** As McBryde itself correctly notes in its May 6, 1986 Reply Memorandum, page 29, "There is no question that these fees are substantial. However, the enormity of the fees is due entirely to the conduct of the State Officials in the

manner in which this litigation has been pursued.

**46.** State's Memorandum in Opposition, filed May 2, 1986, p. 78.

**47.** Exhibit L of the State's Memorandum of May 2, 1986.

neys were not entitled to any fee reimbursement at all. That this argument is entirely without merit is pointed up by *Ohio–Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 776 F.2d 646 (7th Cir.1985). In that case, both plaintiffs and defendants, all corporate entities, regularly paid their attorneys. Although *Ohio–Sealy Mattress* was an antitrust action brought under section 4 of the Clayton Act (15 U.S.C. § 15 (1982)), the *Ohio–Sealy* court nevertheless likened the bonus or upward adjustment to a like purpose in civil rights cases.[48]

Plaintiffs who pay their own attorneys' fees are entitled to the same rights as those who cannot pay. The purpose of the Fees Act was to eliminate the barrier of expensive litigation costs to the assertion of civil rights. The Fees Act was not passed solely for the purpose of benefitting the attorneys, to make sure that if they represented the successful plaintiff their fees would be paid. The purpose was to encourage filing of civil rights acts.

Congress' purpose in authorizing the award of attorneys' fees under § 1988 was to remove the financial impediments that might otherwise hinder a private citizen from asserting his or her civil rights. S. Rep. No. 1011, 94th Cong., 2d Sess. 2, *reprinted in* 1976 U.S. Code Cong. & Ad. News 5908, 5910.

*Pekarsky v. Ariyoshi*, 695 F.2d 352, 358 (9th Cir.1982), *cert. denied*, 464 U.S. 1052, 104 S.Ct. 735, 79 L.Ed.2d 194 (1984) (Choy, J. dissenting). *See Ackerley Communications, Inc. v. City of Salem*, 752 F.2d 1394, 1397 (9th Cir.) *cert. denied*, 472 U.S. 1028, 105 S.Ct. 3503, 87 L.Ed.2d 634 (1985) (plaintiff's ability to pay is irrelevant). Even a fee-paying corporate plaintiff is fully entitled to recover all reasonable fees and costs that it has incurred and paid.

As noted above, the State now infers that "intervening Supreme Court" precedent caused it to change its position that some inflationary adjustment should be used to compensate McBryde for delay in payment. Not surprisingly, the State cited no such case!

As indicated, it is now the position of the State that it is only an attorney who was not paid during the litigation who is entitled to any enhancement of fees because of delay in payment. The State maintains that since the plaintiff, McBryde, paid its attorneys' fees during the litigation, it is entitled to recover nothing for the loss of use of its money over the years the State has viciously fought every attempt of the plaintiffs to recover their judicially expropriated water rights. McBryde is entitled to recover recompense for the loss of use of the money it has necessarily spent (and will spend) over these years of litigation. *Pennsylvania v. Delaware Valley Citizens' Council*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987), *Jordan v. Multnomah County*, 815 F.2d 1258 n. 7 (9th Cir. 1987). In *Clark v. City of Los Angeles*, 803 F.2d 987, 991–93 n. 6 (9th Cir.1986), Circuit Judge Canby (with Judges Wallace and Faris) wrote:

An adjustment for delay may represent an award of interest, an adjustment for inflation, or both. The rate of interest itself may reflect inflation. Factors of delay, interest and inflation therefore may overlap very substantially.

McBryde maintains that during all the years of this litigation its parent corporation, Alexander & Baldwin, Ltd., was a financially solvent, net investing corporation that would have been able to use the money paid by McBryde to its attorneys for investment purposes. McBryde asks that it be paid interest at the prevailing market rates over the past 15 years on the attorneys' fees as they were paid, i.e., from the times of payment. An adjustment based upon the actual interest rate that McBryde lost is capable of accurate calculation. As stated by Judge Waters in *Chalmers v. City of Los Angeles*, 676 F.Supp. 1515, 1527 (C.D. Cal.1987),

[A]n adjustment based on the inflation rate improperly measures the true loss from delay ... it fails to compensate for the loss of use of that money ... The historic market rate of interest, which is in fact partly linked to the inflation rate,

---

**48.** *Ohio–Sealy Mattress Mfg. Co. v. Sealy, Inc.,* 776 F.2d 646, p. 662.

is a more relevant factor in measuring loss from delay. *Institutionalized Juveniles [v. Secretary of Public Welfare,]* 758 F.2d [897] at 923, n. 41 [3rd Cir. 1985]; *Gaines v. Dogherty County Bd. of Education,* 775 F.2d 1565, 1572, n. 14 (11th Cir.1985).

If the State's claim that McBryde is entitled to nothing for delay in payment were to be followed, then, judging from the persistently intensive attempts on the part of the State to forestall any recovery of their water rights by the plaintiffs, this court can only conclude that the last remaining deterrent to the State's apparent attempt to carry on this litigation forever would be taken away. The State would have no disincentive to bring either the substantive litigation or the fee petition to a, hopefully, speedy conclusion.

This court was prepared to order the payment of interest due McBryde as of May 31, 1988. Because, as reflected above, the State has forced this court into a detailed examination into the law and facts on the multitude of issues raised by the State, the conclusion of this decision has been delayed. On January 9, 1989, McBryde filed with this court a "Supplemental Memorandum Regarding Compensation to McBryde Sugar Company, Ltd., for Delay from January 1, 1988 Through December 31, 1988." This court agrees with McBryde's suggestion that the interest be computed through December 31, 1988. Therefore, for delay in payment, this court awards McBryde $1,156,477.90 as lost interest through December 31, 1988, as calculated by McBrydes method on the $1,179,467.80 which this court has determined above to be the reasonable attorneys' fees, costs, and expenses McBryde has incurred and paid over the years 1973 to and including December 31, 1987.

XIII. THE ELEVENTH AMENDMENT AND AWARDS FOR DELAY IN PAYMENT

The State maintains that the Eleventh Amendment precludes compensating McBryde for delays in payment whether by

way of awarding interest or by any other method. In its Memorandum in Opposition, filed May 9, 1988, the State maintains that Supreme Court cases "and the absence of any override of the State's Eleventh Amendment immunity from interest awards" precludes any adjustment for delay.[49] The State arrives at its conclusion based upon *Library of Congress v. Shaw,* 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986) and the 1st circuit's interpretation of *Library of Congress* in *Rogers v. Okin,* 821 F.2d 22 (1st Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 709, 98 L.Ed.2d 660 (1988). The 1st circuit, in *Rogers,* concluded that the State continued to enjoy Eleventh Amendment immunity from enhancement of fee awards for delay.

The 8th circuit, however, in *Jenkins v. Missouri,* 838 F.2d 260 (1988), expressly rejected *Rogers v. Okin,* supra. The *Jenkins* court pointed out that *Shaw* involved an award of attorneys' fees in a Title 7 case against the *federal* government, in which the district court increased the lodestar by 30% to compensate for delays in payment. The Supreme Court in *Shaw* reversed on the grounds that the award or interest on the fees was forbidden by the "no-interest" rule of statutory interpretation applicable in suits against the *federal* government. The *Jenkins* court stated,

"We cannot agree with the *Rogers* court that the holding in *Shaw* is applicable in a case involving eleventh amendment, rather than federal sovereign immunity, or to a case where the court awards current rates or considers delay as one factor in setting a compensatory fee award ... We see no reason to extend *Shaw* to the body of eleventh amendment law, which was not covered by its rationale.

The *Jenkins* court concluded:

At any rate, the eleventh amendment is not a barrier to recovery of fees against a state under section 1988,

citing, *see generally Hutto v. Finney,* 437 U.S. 678, 693–94, 98 S.Ct. 2565, 2574–75, 57 L.Ed.2d 522 (1978); *Sisco v. J.S. Alberici*

**49.** *Id.,* p. 29.

*Construction Co.,* 733 F.2d 55, 59 n. 3 (8th Cir.1984); *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 951, 955 (1st Cir.1984); *Daly v. Hill,* 790 F.2d 1071, 1081 (4th Cir.1986); *Lightfoot v. Walker,* 826 F.2d 516, 523 (7th Cir.1987); *Jordan v. Multnomah County,* 815 F.2d 1258, 1262–63 n. 7 (9th Cir.1987); *Ramos v. Lamm,* 713 F.2d 546, 555 (10th Cir.1983); and *Gaines v. Dougherty County Board of Education,* 775 F.2d 1565, 1572 (11th Cir.1985). The *Jenkins* court further commented (p. 266) that in *Pennsylvania v. Delaware Valley Citizens' Council,* 483 U.S. 711, 107 S.Ct. 3078, 3081–82, 3099, 97 L.Ed.2d 585 (1987), "both the majority and dissenting justices seem to have approved award of delay compensation under the 'typical fee-shifting statute.'"

This court has reviewed the two district court cases in the 9th circuit, cited by McBryde [50], viz., *Keith v. Volpe,* 501 F.Supp. 403 (C.D. Cal.1980), and *Keith v. Volpe,* 644 F.Supp. 1312 (C.D.Cal.1986) as well as *Keith v. Volpe,* 833 F.2d 850 (9th Cir.1987) and *Keith v. Volpe,* 858 F.2d 467 (9th Cir.1988). In the first *Keith,* circuit judge Pregerson, sitting by designation on the district court, awarded current hourly attorneys' rates against the State of California (post *Shaw*). He also expressly considered and rejected the general issue of Eleventh Amendment immunity. In *Spain v. Mountanos,* 690 F.2d 742 (9th Cir.1982), the 9th circuit held that post-judgment interest could be recovered on a fee award under section 1988.

In *Hobbs v. Director, Office of Wkrs. Comp. Programs,* 820 F.2d 1528, 1530 (9th Cir.1987), the 9th circuit, while denying interest against a federal agency but recognizing the distinction between purposes of civil rights statutes and other statutes, suggested that "where delay is extreme, reliance on historical rates—which logically might be said to contemplate normally expected delay—may render unreasonable an otherwise reasonable attorney's fee by cutting too deeply into the attorney's ultimate award." *Hobbs* also recognized that "where awards of attorney's fees are gen-

erally understood to complement the purposes of the relevant prohibitory statutes by encouraging private enforcement of the statutes themselves, assessments of interest on fee awards have been seen as necessary incidents to enforcement," citing *Spain v. Mountanos,* 690 F.2d, 742, supra, and *Gates v. Collier,* 616 F.2d 1268, 1275 (5th Cir.1980).

This court believes that both the Supreme Court and the 9th circuit have consistently not only allowed awards of attorneys' fees against a state, but have also given approval of awards for delay in payment in addition to plaintiffs' basic right to a "reasonable" fee.

As stated in the beginning of this decision, this court reiterates that it can only condemn the actions of the Attorney General of the State of Hawaii from the moment that the Supreme Court expropriated the property of the plaintiffs and gave it, gratis, to the State. Almost to repeat myself, the Attorney General could have, and should have, no later than when this action was filed in this court in 1974, acknowledged error on the part of the Hawaii Supreme Court in its attempt to take, without due process, the property of all of the plaintiffs. Such action by the Attorney General would have properly and with justice ended the litigation 14 years ago. As I have said, the State, nevertheless, in implementing its greed as well as following the political objectives of its Governors, has done everything possible to keep the plaintiffs' unconstitutionally expropriated property. The State has extended this litigation far, far beyond reasonable limits. The extraordinary delay in ending this litigation, persistently and insistently fostered by the State, calls for the maximum reimbursement to McBryde which is allowable under the law.

From the preceding, it can be seen that this court intends to give McBryde as full repayment as the law will allow for the financial losses it has directly incurred because of this litigation.

---

**50.** McBryde's Reply Memorandum of May 18, 1988, p. 23–25.

This court recognizes that neither the Supreme Court nor the 9th circuit has *directly* addressed the Eleventh Amendment problem presented in this case.[51] While this court believes that the Eleventh Amendment does not bar recovery from the State of Hawaii of the interest this court has awarded McBryde, nevertheless this court cannot forget the admonition generally credited to the late, great, Judge George Boldt of the Western District of Washington: "District judges are not paid to be right, they are paid to make decisions. The circuit judges are paid to be right."

Since the Eleventh Amendment question has not been "finally" determined by a court "that is paid to be right," McBryde has asked that this court take an alternative method of compensating McBryde for delay in payment of the attorneys' fees it has paid, in the event that this court's analysis of the Eleventh Amendment issue is not affirmed.

McBryde has requested, as an alternative to the award of interest, that this court use the method of awarding McBryde payment of attorneys' fees at current hourly rates in order to secure its objective.

This court would actually prefer not to use the alternative method of current hourly rates for that purpose. McBryde was not charged current billing rates. Also, the court recognizes that the cases using this method seemed to be those in which the attorneys themselves had carried the financial burden of delay in payment. This court notes that in *Pennsylvania v. Delaware Valley Citizens' Council, supra,* although the issue of compensation for delay in payment of attorneys' fees was not involved, The Court nevertheless acknowledged that courts regularly recognized the delay factor "either by basing the award on current rates or *adjusting* the fee based on historical rates to reflect its present value." 483 U.S. at ——, 107 S.Ct. at 3081, 97 L.Ed.2d at 592. (Emphasis added.)

The Court did not set forth the method by which this "adjustment" should be made. This court notes that in *Greater L.A. Coun. on Deafness v. Comm. TV of So. Cal.,* 813 F.2d 217, 221 (9th Cir.1987), decided on March 18, 1987, the district court justified its use of a "multiplier" to enhance the lodestar amount"(1) because of the contingent nature of the case and (2) because of delay in payment of fees." The circuit court held that *Shaw, supra,* prohibited the use of a multiplier to enhance fee awards because of delay in payment, and stated, "As a matter of law, we eliminate the multiplier." The 9th circuit panel did not have the benefit of *Pennsylvania v. Delaware Valley Citizens' Council,* which was decided on June 26, 1987.

It appears to this court that *Pennsylvania v. Delaware Valley Citizens' Council, supra,* inferentially overruled the 9th circuit's conclusion in *Greater L.A. Coun. on Deafness v. Comm. TV of So. Cal., supra.* It likewise appears to this court that the only way in which a fee based on historical rates could be "adjusted" to reflect its present value would be by way of a multiplier of the original lodestar fee.[52] As indicated heretofore, basically all that McBryde has asked is that it recover its losses. Therefore, this court would award to McBryde, in addition to the lodestar fee heretofore allowed by this court, a multiplier of 0.9805 to bring McBryde's award up to the figure of $2,235,936.10, which this court feels is below the minimum just and equitable amount which McBryde should recover from the State.

In the event that the appellate court should not approve either the award of

---

**51.** This court notes that on October 11, 1988, the Supreme Court granted certiorari in *Missouri v. Jenkins,* —— U.S. ——, 109 S.Ct. 218, 102 L.Ed.2d 209, so this issue may be directly addressed in 1989.

**52.** The Third Circuit Task Force on Court Awarded Attorneys' Fees Report of October 8, 1985, set forth in 108 F.R.D. 237, on p. 265, stated:

Other factors that the Task Force thought should be considered in adjusting the basic fee are ... (3) the delay in receiving attorneys' fees ... As to the third factor ... the court may either use a multiplier or may make an award to the attorney under the current scheduled hourly rate....

interest, or a multiplier, as proper recompense to McBryde for delay in payment, this court proposes a second alternative.

As indicated above, in designing a method for compensating the successful plaintiff for delay in payment, some courts have awarded fees at current market rates against a State. In *Lightfoot v. Walker*, 826 F.2d 516 (7th Cir.1987), also a post-*Shaw* decision, the 7th circuit approved the award of fees at *current* market rates as opposed to historic rates against the State of Illinois to compensate for delay in payment. In *Jordan v. Multnomah County*, 815 F.2d 1258, 1262 n. 7 (9th Cir.1987), the court recognized the use of *current* billing rates as one method of compensating for the effects of inflation. Judge Pregerson, in the first *Keith v. Volpe, supra,* also awarded *current* hourly rates against the State of California. McBryde itself has suggested that the court use this method and has submitted Exhibit B with its Memorandum in Support of its Motion, filed April 14, 1988, setting forth its compilation of fees at current billing rates.

The court has reviewed McBryde's Exhibit C and finds that the current hourly rate for each attorney now in the CSF & W firm was that attorney's normal billing rate made effective for the firm as of February 1, 1988. For the attorneys who left the firm in 1987, the rate shown is their lowest billing rate, as shown in McBryde's Exhibit B, at the time they left the firm. For attorneys Stivers and Yoshida, the rate is the estimated current rate those attorneys would have had at the time of McBryde's 1985 fee application.

The court is only too familiar with the current billing rates of Honolulu firms. This court has a steady flow of applications for fees coming before it in the several big bankruptcy cases that it has had, and still has, before it over the last several years. The "current" fees, as set forth in McBryde's Exhibit C, are "reasonable" attorneys' fees in the Honolulu legal market

for services and expertise of attorneys of the quality accredited to CSF & W. From its own observation in the cases before it, this court finds that the current hourly rates allotted to the mainland experts likewise must be considered reasonable.

Therefore, as indicated above, as a second alternate method of compensating McBryde for its losses, this court awards McBryde, as an adjustment based on current hourly rates, after deduction of those hours heretofore specified in pp. 1430–1431 and 1432, the sum of $1,948,032.72, for the period 1973 through December 31, 1987,[53] a sum below the equitable minimum McBryde deserves.

As noted on page 1417, supra, in addition to McBryde's request for an upward adjustment to compensate for delay in payment, McBryde has requested (1) a further upward adjustment for the amount of time spent by McBryde's attorneys on the litigation and not billed to McBryde, and (2) an upward adjustment because of the effect of the litigious posture of the State officials.

This court is satisfied, from the affidavits of McBryde's attorneys Cades and Bunn, that they, as well as other of McBryde's attorneys in the case, have not billed McBryde for all of the time, effort, and expertise they have committed to overturning the State's claim of the judicially expropriated water and water rights.

As heretofore noted and decried by this court, the State "has contested this case to the nth degree."[54] If this Motion were not for the purpose of enabling McBryde to recoup some of its basic financial losses emanating from the State's actions, this court would not hesitate to increase the fees award in the manner requested. That McBryde's attorneys, in their endeavor to thwart the State's inordinate avarice, were willing to forego charging McBryde for every moment they spent in developing the law and facts to save McBryde, can only

---

**53.** In arriving at this figure, this court has deducted, at current rates, those attorneys' fees (hours) which this court has disallowed, supra, from the total award for delay, Exhibit "B", set

forth in McBryde's Supplemental Exhibit, filed June 6, 1988.

**54.** McBryde's Memorandum in Support of Motion for Fees, filed April 14, 1988, p. 16.

bring to them the greatest praise. They exemplify the finest professional attitude that can be credited to an attorney.

If McBryde's attorneys in this case had not been paid as billed, then fairness and equity would impel this court to grant a further upward adjustment to compensate McBryde's attorneys for their unbilled time, and penalize the State for its unwarranted litigiousness. However, McBryde's attorneys were paid substantially as billed by them to their clients. The instant Motion is to repay McBryde, not to pay its attorneys. This court, therefore, must, reluctantly, refuse to add the requested addendum for either unbilled time, or the State Attorney General's litigiousness.

## CONCLUSION

IT IS ORDERED that the State pay to McBryde $1,179,467.80, as reasonable attorneys' fees and costs incurred and paid, plus $1,156,477.90 interest thereon through December 31, 1988 for delay in payment, for a total award of $2,335.945.70 or in the alternative, in lieu of adding interest, (A) based on the multiplier, the total sum of $2,335,936.10, or (B) based on the current hourly rates of McBryde's attorneys the total sum of $1,948,032.72.